RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0249p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 05-5835

TERRY WILLIAM HARNESS,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 04-00087—Thomas W. Phillips, District Judge.

Argued: May 11, 2006

Decided and Filed: July 17, 2006

Before: SUTTON and McKEAGUE, Circuit Judges; CALDWELL, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Paula R. Voss, FEDERAL DEFENDER SERVICES, Knoxville, Tennessee, for Appellant. Tracee J. Plowell, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Paula R. Voss, FEDERAL DEFENDER SERVICES, Knoxville, Tennessee, for Appellant. Tracee J. Plowell, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

---

**OPINION**

---

SUTTON, Circuit Judge. In this appeal, Terry Harness raises two arguments: (1) that the police violated his Fourth Amendment rights when they entered his house without a warrant and found guns there and (2) that his 44-month sentence is unreasonable. Because the officers had probable cause to arrest Harness, because they permissibly followed Harness into his house after they had placed him in custody and because the officers observed the guns in plain view inside the house, the district court did not err in denying the suppression motion. And because the court properly calculated Harness's sentencing guidelines range and permissibly applied the § 3553(a) factors to Harness in giving him a within-guidelines sentence, the district court did not impose an unreasonable sentence. We affirm.

---

[*] The Honorable Karen K. Caldwell, United States District Judge for the Eastern District of Kentucky, sitting by designation.

I.

On Saturday, February 21, 2004, Russell Self, a deputy with the Grainger County Sheriff's Department, investigated a claim of sexual molestation made by Harness's ex-wife, Sandra Osborn. Osborn told Self that Harness had propositioned her 10-year-old son while he and his 14-year-old brother were staying with their father during the previous weekend. Self interviewed Osborn and both sons. The younger son told Self that his naked father had approached him and asked him to perform a sex act. The older son, though unable to verify any details of the encounter because he had been asleep, corroborated that the encounter could have occurred on the date and at the time and place that his younger brother said it did. Osborn also informed Self that Harness had a prior conviction for sexual battery. After speaking with Osborn and the two boys, Self and his partner, Deputy Sheriff Barnard, verified Harness's prior conviction for sexual battery with the police dispatcher, though they were unable to locate Harness's name on a sex-offender internet website.

The deputies drove to Harness's house. As they entered his driveway, Harness came out of the house and stood on his front porch with his hands in his pockets. The officers instructed Harness to leave his hands in his pockets, patted him down for weapons and handcuffed him. They advised Harness of his rights, told him about his son's allegation and asked why he did not appear on the sex-offender registry. Harness responded that he had filled out the sex-offender forms each month.

Self explained that he was arresting Harness for failing to register with the sex-offender registry and asked Harness if he "needed anything . . . inside the house or [to] turn anything off" before they drove him to the police station. JA 95. Harness responded that he needed his wallet, keys and cigarettes. When Harness entered the house to retrieve these items and turn off the stove in the kitchen, the deputies followed him. Once inside the house, the officers spotted two guns propped up against the wall in the hallway and two more in a gun rack in the bedroom. After seizing the guns, the officers took Harness to the police station.

On Monday morning, Self contacted the Tennessee Bureau of Investigation and determined that Harness had fulfilled his sex-offender registration requirements. (Having been convicted before 1997, Harness, it turns out, was under no obligation to be listed on the public internet database.) Harness was charged in state court with attempted aggravated sexual battery, which the court later dismissed, and in federal court with being a felon in possession of a firearm.

In the federal case, Harness made a pretrial motion to suppress the guns found in his house. Adopting a magistrate's report and recommendation, the district court rejected the motion, after which Harness conditionally pleaded guilty, reserving the right to raise his constitutional challenge on appeal. The district court sentenced him to 44 months in prison.

II.

Harness first argues that the officers did not have probable cause to arrest him on the porch. The existence of probable cause, quite familiarly, depends on "whether, at the moment the arrest was made, . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Not surprisingly, "[a]n eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (internal quotation marks omitted); *see also Thacker v. City of Columbus*, 328 F.3d 244, 257 (6th Cir. 2003) (holding that a victim's statement that the defendant "had abused her alone is sufficient to establish

probable cause" to arrest the defendant for domestic violence); *Klein v. Long*, 275 F.3d 544, 551 (6th Cir. 2001).

Gauged by these precedents, Self had probable cause to arrest Harness. He had spoken directly to the victim about the attempted sexual battery, and nothing about the allegation itself cast doubt on the victim's reliability. *See Ahlers*, 188 F.3d at 370. The older brother corroborated that the victim was at Harness's house and separated from his brother at the time of the incident, confirming that there was a "window of time within which the alleged sexual assault could have occurred." *Id*. at 370–71; *see also id*. (A victim's accusation, "especially when bolstered by . . . records which confirm that there was a window of time within which the alleged sexual assault could have occurred," is "sufficient to establish probable cause."). And Self verified Osborn's claim that the State had previously convicted Harness of sexual battery.

Harness complains that the officers did not interrogate him about the allegation and did not obtain independent, trustworthy evidence to support the allegations. But "once a police officer has sufficient probable cause to arrest, he need not investigate further." *Klein*, 275 F.3d at 551; *see also id*. at 552 ("Where the police have sufficient inculpatory evidence to give rise to a determination of probable cause and they do not know of any exculpatory evidence, . . . the failure to make a further investigation does not negate probable cause.") (internal quotation marks omitted).

Harness also complains that the deputies arrested him for violating Tennessee's sex-offender-registration laws, not for attempted sexual battery. Noting that a registration violation is a misdemeanor under Tennessee law and noting that Tennessee law prohibits officers from making warrantless arrests for misdemeanors, Harness argues that his arrest necessarily was illegal. As the Supreme Court has explained, however, an arresting officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citations omitted); *see also United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991) ("[K]nowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed by the defendants."); *id*. ("Just as a subjective belief by the arresting officer would not establish probable cause where none existed, a subjective belief by the arresting officer cannot destroy probable cause where it exists.").

Even if the deputies had probable cause to arrest him, Harness argues that their warrantless entry into his house violated the Fourth Amendment. Supreme Court precedent, however, cuts the initial legs out from under this argument and other precedents remove any remaining support for this position. In *Washington v. Chrisman*, 455 U.S. 1, 6 (1982), a police officer saw a student from Washington State University leave a student dormitory with a half-gallon bottle of gin. State law prohibited the possession of alcohol by persons under 21, and the officer suspected that the student did not satisfy this requirement. When the officer asked the student for identification, the student responded that he needed to return to his dormitory to get it. The officer explained that he would have to follow the student to his dormitory room, to which the student replied "OK." *Id*. at 3. Once in the dormitory room, the officer noticed that the student's undoubtedly surprised roommate, the Chrisman in the case, appeared to have a marijuana pipe and seeds.

In rejecting Chrisman's motion to suppress this evidence, the Court reasoned that "the officer had placed [the student] under lawful arrest, and therefore was authorized to accompany him to his room for the purpose of obtaining identification." *Id*. at 6. In doing so, "[t]he officer had a right to remain literally at [the arrestee's] elbow at all times; nothing in the Fourth Amendment is to the contrary." *Id*. Nor did it make a difference whether the officer had "an affirmative indication" that the "arrested person might have a weapon available or might attempt to escape"; nor was the officer's "authority altered by the nature of the offense for which the arrest was made." *Id*. at 6–7. "Every arrest," the Court concluded, "must be presumed to present a risk of danger to the arresting

officer" because "[t]here is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger." *Id.* at 7.

Our sister circuits have applied the *Chrisman* rule in a variety of contexts. *See United States v. Debuse*, 289 F.3d 1072, 1074 (8th Cir. 2002) (holding that an officer could accompany an arrestee "into his residence to obtain clothing or identification"); *United States v. Berkowitz*, 927 F.2d 1376, 1389 (7th Cir. 1991) (holding that where an arrestee asked to retrieve his keys from a room in his house, officers could follow him into that room); *United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir. 1977) ("Having permitted [the arrestee] to retire to her bedroom to dress, [the officer] was clearly justified in accompanying her to maintain a 'watchful eye' on her and to assure that she did not destroy evidence or procure a weapon.").

In the face of these precedents, the deputies plainly had authority to follow Harness into his house when he sought to retrieve his keys, wallet and cigarettes. At that point, the deputies had placed Harness under arrest and thus had every right "to remain literally at [his] elbow at all times," *Chrisman*, 455 U.S. at 6, no matter whether he presented a specifically identifiable risk or not.

Harness's response that the police somehow "coerced" his consent to enter the house misses the point. The issue is not consent but the risks officers would incur by allowing an arrested criminal suspect to roam freely about his home: risks to officer safety, risks of the destruction of evidence, risks of escape—risks that officers must "presume[]" surround "[e]very arrest." *Id.* at 7. The deputies had authority to follow Harness into the residence not because he told them they could but because they had legitimately placed him in custody and therefore had a right to keep him within their control—something they assuredly could not do if they allowed him to enter the house by himself. *See Berkowitz*, 927 F.2d at 1389 (An "officer's authority to monitor a suspect does not depend on the suspect's consent; a suspect under arrest has no right to wander off on his own.").

Nor does it make a difference that the officers, rather than Harness, initially asked whether Harness "needed anything . . . inside the house." JA 95. The officers did not compel him to enter his house. And while Harness may in retrospect have regretted his decision to re-enter the house, he does not claim that the decision was anyone else's but his. "[I]ncreasing a suspect's options"—here by providing an option that many suspects (without evidence of a crime in plain view inside the home) would welcome—"cannot harm him," and "a suspect's poor choice does not render unconstitutional an officer's objectively reasonable offer." *United States v. Garcia*, 376 F.3d 648, 651 (7th Cir. 2004).

Harness, finally, argues that his sentence was unreasonable because the district court failed properly to consider the § 3553(a) factors in determining his sentence. *See United States v. Booker*, 543 U.S. 220, 262 (2005). We disagree.

While we may invalidate a sentence as unreasonable if the district court fails to consider the § 3553(a) factors, *United States v. Richardson*, 437 F.3d 550, 553 (6th Cir. 2006), we have "never required the ritual incantation of the factors to affirm a sentence," *United States v. Johnson*, 403 F.3d 813, 816 (6th Cir. 2005) (internal quotation marks omitted). In sentencing Harness, the district court indicated that it would "treat[] the sentencing guidelines as advisory only," JA 158, adjusted Harness's offense level for his acceptance of responsibility and mentioned that it had received a psychological report and letters from Harness's mother, uncle, aunt and brother. Harness indicated that he had no objections to the presentence report, agreed that the guidelines sentencing range was 37 to 46 months and requested "the minimum sentence . . . that the court finds reasonable in this case." JA 160. Invoking "a need to protect society . . . from this individual," the government requested a sentence "at the top end of the sentencing guidelines range." JA 160–61. After "consider[ing] the nature and circumstances of the offense, the history and characteristics of the

defendant and the advisory guideline range, as well as the other factors listed in 18 [U.S.C. §] 3553(a)," the court sentenced Harness to 44 months' imprisonment. JA 161. The court explained that the sentence "is in the middle of the guideline range" and will "afford adequate deterrence and provide just punishment." JA 162.

Harness argues that by referencing only "just punishment" and "adequate deterrence" specifically, the district court did not sufficiently consider the other § 3553(a) factors. But this argument is foreclosed by *United States v. Chandler*, where we held that an identical specific reference to these two § 3553(a) factors, and no others, sufficed to support a finding of reasonableness. 419 F.3d 484, 488 (6th Cir. 2005). In the end, the district court properly calculated Harness's advisory guidelines range and sentenced Harness within that range. Harness has not pointed to anything else suggesting that his sentence is unreasonable. We must therefore uphold Harness's sentence.

III.

For these reasons, we affirm.