*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0364p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 05-6110

BRENDAN ALLEN SHAW,

*Defendant-Appellant.*

>

---

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 04-00014—Thomas B. Russell, District Judge.

Argued: July 18, 2006

Decided and Filed: September 26, 2006

Before: GILMAN and SUTTON, Circuit Judges; WISEMAN, Senior District Judge.[*]

---

## COUNSEL

**ARGUED:** Patrick J. Bouldin, WESTERN KENTUCKY FEDERAL COMMUNITY DEFENDER, INC., Louisville, Kentucky, for Appellant. Monica Wheatley, ASSISTANT UNITED STATES ATTORNEY, Louisville, Kentucky, for Appellee. **ON BRIEF:** Patrick J. Bouldin, WESTERN KENTUCKY FEDERAL COMMUNITY DEFENDER, INC., Louisville, Kentucky, for Appellant. Monica Wheatley, Terry M. Cushing, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

WISEMAN, D. J., delivered the opinion of the court, in which GILMAN, J., joined. SUTTON, J. (pp. 14-16), delivered a separate dissenting opinion.

---

## OPINION

---

WISEMAN, Senior District Judge. Defendant-Appellant Brendan Allen Shaw ("Shaw" or "Defendant") appeals the denial of his motion to suppress three written statements made while he was held in custody for nearly twenty hours at Fort Campbell Army Base on June 22, 2004. As a result of the statements, Shaw was charged in a ten-count indictment, all ten counts of which involve child sexual abuse in violation of 18 U.S.C. §§ 2241(c) and 2246(2). After Shaw's Motion to

---

[*] The Honorable Thomas A. Wiseman, Jr., Senior United States District Judge for the Middle District of Tennessee, sitting by designation.

Suppress was denied, he entered a conditional plea of guilty while reserving the right to appeal the district court's denial of his suppression motion. Because we conclude that Shaw was arrested without probable cause and in violation of his Fourth Amendment rights, the order of the district court denying Shaw's Motion to Suppress is REVERSED and this matter is REMANDED for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

At the time of his arrest in June 2004, Brendan Shaw was two months shy of his nineteenth birthday and had an eleventh-grade education. He was living with his cousin and cousin's wife, Aaron and Angie Shaw, and their three children (all boys), ages one, three, and five,[1] as a live-in babysitter. He had been living with his cousin's family for approximately four months.

On the evening of June 21, 2004, Angie Shaw brought her three-year-old son to the Blanchfield Army Community Hospital ("BACH" or "Hospital") emergency room ("ER") to be examined. She told medical personnel at the ER that the three-year-old had claimed that Shaw had "touched his pee-pee" and that Shaw's "pee-pee had touched his butt." (Joint Appendix ("JA") 7.) The doctor who examined the child found no physical evidence of trauma or sexual penetration. Military Police ("MP") were nonetheless called to the hospital and told of the allegation.

MP Investigator Edgar J. Ford was on duty the evening of June 21, 2004. He was notified by the MP station of a possible sexual assault reported at BACH, so he went to the Hospital to investigate. On the way there, he placed a telephone call to Special Agent ("SA") Rebecca Fagan, who was on call for the Army Criminal Investigation Division ("CID"), to inform her that he was responding to a possible sexual assault. He arrived at BACH at approximately 11:20 p.m. where he met initially with a Nurse Slaughter, who told him what Angie Shaw had said. He then spoke with Angie Shaw, who repeated the allegation. He did not interview or speak with the three-year-old child.

At that point, Ford called SA Fagan back and asked her to join him at the Hospital. After she arrived, Fagan spoke with Angie Shaw and asked her to come down to the CID office. Angie Shaw was concerned about needing to drop off the three-year-old child at a neighbor's and did not want to have any kind of confrontation with the Defendant, nor did she want the children to see him. Consequently, SA Fagan directed Ford to "[go] over and get him [Defendant]." (JA 84.) As directed, Ford went to the Shaw family's "quarters," accompanied by a trainee officer who was riding with him that night. They were in an unmarked police car. Ford was not in uniform but he was armed. Ford was not sure what time it was when they arrived at the Shaws' residence, but it was after midnight. Another police car carrying Sergeant Wilburn and his military working dog also arrived on the scene shortly after Ford.

At the Shaws' residence, Ford found the Defendant in front of the house with another teenager who also lived on base. Ford told the other teenager to go home and told Shaw "they needed to talk to him down at CID." (JA 85.) Ford did not tell Shaw why "they" wanted to talk to him at CID. He also testified that he did not place Shaw under arrest at that point, but neither did he tell him he was not under arrest. Instead, he frisked him and handcuffed him before placing him in the backseat of the police car. Ford stated he handcuffed Shaw only because the MP's standard operating procedure required handcuffing anyone going into the back of an uncaged car for officer safety. Ford did not explain that fact to Shaw either, however. Ford also did not permit Shaw to go inside and put shoes on before leaving—Shaw arrived at CID fully dressed except that he was wearing socks and no shoes.

---

[1]The children are identified by their ages only.

Ford and Shaw arrived at the CID office shortly after 2:00 a.m., and Shaw was placed in an interview room. Shortly thereafter, SA Richard Wolfington went into the interview room, introduced himself, removed Shaw's handcuffs, and made sure Shaw was comfortable and did not need any type of medical attention. Wolfington left to attend to another matter,[2] and Shaw waited in the interview room for approximately thirty to fifty minutes before Wolfington returned.[3]

After this brief delay, at some time between 2:30 and 2:50 a.m., Wolfington moved Shaw from the interview room into another room. This second room (the "Polygraph Suite") had a two-way mirror/window[4] in it as well as a desk, a few chairs, and a polygraph chair. From an adjacent room, other agents could watch and listen to the interrogation taking place in the Polygraph Suite.

The first thing Wolfington did when he began his session with Shaw was to go over "DA Form 3881," which is the Army's version of a *Miranda* rights waiver. This waiver was introduced into evidence at the suppression hearing, and Wolfington testified that he went over each section of the waiver with Shaw, and had Shaw initial each block in it and then sign it in the indicated place. The waiver form notes that Shaw signed it at 3:10 a.m. on the morning of June 22, 2004.

After Shaw signed the waiver, Wolfington spent the next four to five hours questioning him about the three-year-old's alleged statement to his mother. During that time frame, Shaw was given the opportunity to take bathroom breaks and cigarette breaks when he requested. He was not handcuffed but he was escorted at all times. During the interrogation, Shaw initially denied ever touching the three-year-old's penis, but by 7:45 a.m., he signed a written statement in which he admitted touching the three-year-old incidentally in the course of bathing and dressing him on one occasion, when the three-year-old was having difficulty getting dressed.

Shortly after giving this first statement, Shaw was moved to another room where he was given the opportunity to eat, which he declined, and to sleep. He was given a cot and a tarp-like cover. This room also had an observation window that appeared, from inside the room, to be a mirror. The government witnesses claimed they checked on Shaw several times and believe Shaw slept for nearly six hours. Shaw denies sleeping for much of that time, claiming he was too upset.

Shaw later learned that around 1:45 the same morning he was taken into custody, his uncle, Paul Shaw, received a phone call from Aaron Shaw. Aaron seemed upset and asked Paul to come pick up the Defendant. Paul Shaw left his home in Troy, Indiana around 2:00 a.m. and drove down to Fort Campbell that same night. He arrived at the CID office, where he asked if he could pick up his nephew. He was told he could not. He left his phone number for the Defendant to call him, but Shaw was never given the message that his uncle had been there. It is not clear from the record what time Paul Shaw arrived at CID.

At some point in the early afternoon of the same day, Wolfington took Shaw from the room with the cot to the Hospital to provide a blood sample. The Government claims Shaw voluntarily

---

[2]When Ford picked up Shaw, he asked Shaw if anyone was in the house. Shaw stated (incorrectly) that his cousin and family were asleep in there, and there was also a girl named "Mimi," the girlfriend of the teenager who had been sent home. Ford went inside to get her. She appeared to be drunk. His initial plan was to drop her off at the exit gate to the Base on his way to CID, since she had no authorization to be on the Base. However, he became concerned for her medical condition so he took her to CID along with Shaw. From there she was taken to BACH.

[3]None of the rooms in which Shaw was placed had clocks in them and Shaw was not wearing a watch. Consequently, he had no concept of the time frame over which the events of June 22 took place.

[4]From inside the room, this window looked like a mirror, but from the adjacent room it was a window from which the interrogation could be viewed by other law-enforcement personnel.

went with Wolfington to give a blood sample, but the consent form Shaw allegedly signed has been lost. After the brief trip to the Hospital, Shaw was put back in the same room in which he had been permitted to sleep. Shortly thereafter, he was taken back to the Polygraph Suite where SA Clarence Joubert, III, was waiting for him. The interrogation conducted by SA Joubert began around 3:15 or 3:30 on the afternoon of June 22, 2004.

SA Joubert testified that he is a polygrapher, and his original expectation when he was asked to become involved in the case was that he would perform a polygraph examination of Shaw. His request to perform the polygraph was disapproved, so he instead conducted an interrogation of Shaw. When SA Joubert first came into contact with Shaw, he was aware of the mother's hearsay allegation. He also had a copy of Shaw's first statement as well as some other unspecified background information provided to him by SA Wolfington and SA Angela Janysek. No forensic interview had been conducted of the three-year-old or the other two children. According to Wolfington, the children's father had talked to the five-year-old some time during the day of June 22, 2004 and reported that he had said that Shaw took the children on "love picnics" and gave them hugs. Joubert recalled that he was aware at the time he began his interrogation of Shaw that the five-year-old had denied that Shaw had touched his penis. Wolfington stated he did not learn of the five-year-old's denial until later.

The first thing Joubert did upon meeting with Shaw was once again to go over DA Form 3881, the *Miranda* waiver, which Shaw signed for the second time. Joubert then started questioning Shaw again about the allegation of sexual abuse relating to the three-year-old. At 7:45 p.m., after four to four and a half hours of being interrogated a second time, Shaw signed a second written statement. In that statement, Shaw confessed, in detail, to five instances of sexual molestation of the three-year-old, including touching, attempted anal penetration, and one brief instance of actual penetration. Joubert stated that during the interrogation, Shaw was permitted to take bathroom breaks and cigarette breaks, and was also offered and ate some food. Shaw stated he was able to eat a few french fries and drink a coke. This was apparently the first time he had eaten since the day before.

The second formal statement again focused solely on the three-year-old, so Joubert and Wolfington, together this time, went back for round three, convinced they could obtain information about molestation of the five-year-old and the one-year-old (despite the fact that the five-year-old had denied being inappropriately touched and no other new substantial evidence had surfaced that day). This third round of questioning started shortly after Shaw signed the second statement. Wolfington acknowledged that Shaw made statements at this point indicating that he was tired of being there and that he wanted to go home.

This final round of questioning culminated in Shaw's hand-written confession (the others were typed), in outline form devoid of details such as time and place, to molesting both the five-year-old and one-year-old. This statement was signed at 9:30 p.m., by which time Shaw had been held in custody for nearly twenty hours and had been questioned for approximately eleven of those hours.

After the CID's twenty-hour detention of Shaw, he was transferred to the custody of the FBI and taken to a federal detention facility. He was not taken before a magistrate until sometime on June 23, 2004.

## II. PROCEDURAL HISTORY

After Shaw was indicted on multiple counts of child sexual assault, he filed a motion to suppress his written statements on the grounds that they were obtained in violation of his Fourth Amendment right to be free of unreasonable search and seizure, in that he was detained without a

warrant and without probable cause sufficient to justify a warrantless arrest. In the alternative, Shaw argued that (1) he did not effectively waive his *Miranda* rights; (2) his statements were involuntary in that they were coerced; (3) the CID agents violated Fed. R. Crim. P. 5(a) in failing to bring him promptly before a Magistrate; and (4) the length of time between his initial seizure and his first written statement (not to mention his second and third) fell outside the six-hour "safe-harbor" provision for confessions made while in custody where there is a delay in presentment, provided in 18 U.S.C. § 3501.

The district court agreed with Shaw that he was "seized" for purposes of the Fourth Amendment but found that the MP had probable cause to arrest him. While finding a close call on the issue of whether Shaw's statements were truly voluntary or were coerced, given the length of time during which Shaw was held in custody and interrogated, the lack of sleep and the use of some psychologically coercive tactics during his interrogation, the district court did not find any of Shaw's other arguments meritorious and denied the motion to suppress. Shaw subsequently entered a conditional guilty plea, reserving his right to appeal the denial of the motion to suppress. This appeal followed.

## III. ANALYSIS

### A. Standard of Review

In the context of an appeal of the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law *de novo*. *See, e.g.*, *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir.), *cert. denied*, 543 U.S. 856 (2004); *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). The evidence must be reviewed "in the light most likely to support the district court's decision." *Id.* (citation omitted).

### B. Exclusion of the Written Statements

Shaw argues that he was arrested from the moment SA Ford frisked him, handcuffed him and placed him in the back of the MP car for transport to the CID building to undergo questioning. Shaw further argues that this arrest was without probable cause and, therefore, that his subsequent statements must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963). The Government contests each element of Shaw's position.

#### 1. The Arrest

This court has previously articulated a number of factors to be considered in determining whether a person is detained such that his Fourth Amendment rights are triggered, including "the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force." *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991) (holding that law enforcement officers had crossed the line from an investigative detention into an arrest when they placed the defendant in the back of a police car); *see also Hayes v. Florida*, 470 U.S. 811, 816 (1985) (holding that a person's Fourth Amendment rights are triggered "when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes" (citations omitted)).

In addition, the determination of whether a defendant is in custody for Fourth Amendment purposes "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 320 (1994) (per curiam); *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have

understood his situation."). Given the facts before us, we conclude that a reasonable person in Shaw's position would have believed himself to be under arrest at the time he was handcuffed and transported to the CID office.

The Government's argument that police had the right temporarily to detain Shaw without probable cause to quickly confirm or dispel their reasonable suspicions does not compel a different conclusion, primarily because the detention here was hardly "quick" and because it involved transporting Shaw to the CID office in handcuffs. The Government's argument that there is no evidence that Shaw did not voluntarily accompany the police to CID for questioning, since he did not do or say anything to express his unwillingness to do so, is likewise without merit. Under the law of this circuit, "[c]onsent must be proved by clear and positive testimony and must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion." *United States v. Williams*, 754 F.2d 672, 674–75 (6th Cir. 1985), *cited in United States v. Butler*, 223 F.3d 368, 375 (6th Cir. 2000) (noting that, once the defendant was positioned in the back of the police car, she was unable to leave voluntarily "even if inclined to do so"). In other words, the burden of proving consent is on the Government, and in this case, Shaw was not even permitted to go inside and put his shoes on before being frisked, handcuffed, and placed in the back of the police car. Although he did not express any resistance to going with SA Ford, neither was he given the option of choosing not to go. *Cf. Knaupp v. Texas*, 538 U.S. 626, 631–32 (2003) (finding that the defendant's saying "Okay," when told by a police officer that "we need to go and talk," was not an indication of consent under the circumstances, nor was it significant that the defendant "did not resist the use of handcuffs or act in a manner consistent with anything other than full cooperation"). Under the circumstances, as in *Knaupp*, there is no reason to think Shaw's acquiescence was anything more than "a mere submission to a claim of lawful authority." *Id.* at 631 (citation omitted). The Government has simply failed to carry its burden of showing that Shaw voluntarily accompanied SA Ford to the CID office.[5]

The facts here are basically indistinguishable from those considered in *Dunaway v. New York*, 442 U.S. 200 (1979), in which the State of New York also argued that the defendant voluntarily accompanied police to the station. The Supreme Court nonetheless held that the defendant was "seized" for Fourth Amendment purposes, noting that "Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was 'free to go'; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody." *Id.* at 212; *see also Knaupp*, 538 U.S. at 632 (finding that a defendant who was awakened by police at 3 a.m., handcuffed and led out of the house into the patrol car while wearing nothing but boxer shorts and a t-shirt, and then taken to sheriff's office was arrested for Fourth Amendment purposes). Accordingly, the district court did not err in concluding that Shaw was arrested on the early morning of June 22, 2004, when he was taken into custody by the MP on Fort Campbell and transported to the CID office.

### 2. Probable Cause

Having concluded that Shaw was seized for Fourth Amendment purposes when he was taken into custody during the early morning of June 22, 2004, we must next consider whether such seizure was justified by probable cause. As already indicated, we find that it was not.

---

[5]The Government also argues that the MP's intent was simply to remove Shaw from the premises so Shaw's cousin and family could come home without having to confront Shaw or further expose the children to his presence. The MP's alleged intent was not explained to Shaw, however, and the standard, again, is what a reasonable person would have believed under the circumstances. *Stansbury*, 511 U.S. at 320. Agent Wolfington even admitted it was reasonable for Shaw to believe he was in custody when he was taken to CID.

The standard of probable cause does not require "indubitable or necessarily convincing evidence," *Easton v. City of Boulder*, 776 F.2d 1441, 1450 (10th Cir. 1985), but only so much "reasonably trustworthy information" as "to warrant a prudent man in believing that the [arrestee has] committed or [is] committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause requires "less than evidence which would justify condemnation"; moreover, "a finding of 'probable cause' may rest upon evidence which is not legally competent in a criminal trial." *United States v. Ventresca*, 380 U.S. 102, 107 (1965) (internal quotation marks and citations omitted). Consequently, hearsay may be sufficient to establish probable cause for purposes of issuing a warrant, "so long as a substantial basis for crediting the hearsay is presented." *Illinois v. Gates*, 462 U.S. 213, 241–42 (1983).

An eye witness's statement that he or she saw a crime committed or was the victim of a crime is generally sufficient to establish probable cause. *See United States v. Harness*, 453 F.3d 752 (6th Cir. 2006) (holding that a warrantless arrest was supported by probable cause where police had spoken directly to the victim and "nothing about the allegation itself cast doubt on the victim's reliability," and another witnesses confirmed that there was a "window of time within which the alleged sexual assault could have occurred"); *Ahlers v. Schebil*, 188 F.3d 365, 370–71 (6th Cir. 1999) (concluding that an alleged victim's accusation that she had been sexually assaulted, "standing alone, was sufficient to establish probable cause, especially when bolstered by Sheriff's Department's records which confirm that there was a window of time within which the alleged sexual assault could have occurred").

We are not aware, however, of any situation in which the uncorroborated hearsay statement of a child as young as three, standing alone, has been considered sufficient to establish probable cause. Thus, for example, in the case of *Easton v. City of Boulder*, a civil case for wrongful arrest for child molestation, the Tenth Circuit concluded that police officers had probable cause to arrest the plaintiff where the arrest was based on the allegations of two children, ages three and five. After the parents of one of the children contacted the Boulder Police Department to report that their child had been molested, a detective with training in interviewing juveniles spoke directly with both children and also conducted an investigation that turned up independent evidence corroborating the children's statements. For instance, the children told the detective about being taken to a laundry room where the defendant made a tent out of a chair and a blanket and invited them to come inside, where he allegedly molested them. The detective had the children lead him to the laundry room where the children pointed out the blanket and chair they had previously described. As the court noted, "even if the testimony of [the children] was inadmissible in court, perhaps because of an inability to understand the oath, or for whatever reason, their statements could nonetheless be used as a basis for a probable cause determination to support the issuance of a warrant," particularly given the other corroborating evidence and the officers' own observations of the children's demeanor and behavior. *Easton*, 776 F.2d at 1450.

Likewise, although Judge Sutton, in his dissent, cites several cases for the proposition that "the status of being a three year old does not as a matter of law discredit the victim's accusations," it bears pointing out that, in each case cited, the court specifically noted that a child's testimony was not the only evidence supporting probable cause. *Rankin v. Evans*, 133 F.3d 1425, 1440–41 (11th Cir. 1998) ("In addition to [other] independent evidence linking Rankin to the abuse, Evans relied on [the child's] statements to both her mother and the police in determining that probable cause existed to arrest Rankin."); *Marx v. Gumbinner*, 905 F.2d 1503, 1507 (11th Cir. 1990) ("We need not decide whether the uncorroborated statements of a four-year-old rape victim would constitute probable cause: when defendants detained Marx, they had other significant evidence tending to incriminate him."); *Myers v. Morris*, 810 F.2d 1437, 1456 (8th Cir. 1987) ("In no case did an arrest occur on the basis of only one child's account.").

Further, contrary to the position of the dissent, our determination that probable cause did not exist in this case is *not* based upon an assumption that the police could not believe or rely on the statements of a three-year-old child. In fact, a large part of the problem here is that the police did not interview the child at all. Instead, they relied solely upon the mother's allegation that the child had made a statement indicating possible abuse. In each of the cases cited by the dissent, as well as in *Easton v. City of Boulder*, *supra*, the allegedly abused children were interviewed by police, and the children's statements themselves contributed to a finding of probable cause.[6]

By contrast, in the case at bar, the police neither interviewed the child nor made any effort whatsoever to corroborate the mother's allegations before taking Shaw into custody.[7] In fact, the sum total of information in the possession of the police at the time of Shaw's arrest was that (1) Angie Shaw reported that her three-year-old son had told her that Shaw had touched his penis and that Shaw's penis had "touched his butt"; and (2) the doctor who had examined the three-year-old boy had not found any physical evidence of sexual trauma (or any other trauma). The district court concluded that the lack of physical findings in the medical examination was a neutral factor that neither supported nor detracted from the allegations of sexual molestation, and thus that the mother's report of what her son had told her was the sole piece of evidence upon which the police could have relied. The district court ultimately concluded, however, that this one allegation was sufficient to establish probable cause under a "totality of the circumstances" analysis. The factors that the court considered relevant to this analysis included the court's determination that hearsay testimony from a three-year-old might be admissible at trial, that it was unreasonable to expect the police to interview the child given his age, and that other corroborating evidence could also be very difficult to come by. The court therefore found that the officers' reliance on the mother's hearsay statements was reasonable, and their detention of Shaw was not without probable cause.

The Tenth Circuit was recently faced with a factually similar case in *Cortez v. McCauley*, 438 F.3d 980 (10th Cir. 2006). *Cortez*, like *Easton*, was a civil § 1983 action based upon claims for unlawful arrest. In *Cortez*, however, the district court found and the appellate court agreed that a two-year-old child's complaint to her mother that the babysitter's husband had hurt the child's "pee pee" did not provide probable cause for arrest without further investigation. At the time of the arrest, the only information known to the arresting officers was through a nurse who told them about the mother's complaint. The court stated that "the information relied on to conduct the seizure was not reasonably trustworthy information sufficient on its own to justify the seizure," *id.* at 991, distinguishing the facts before it from those in *Easton*. *Id.* at 990.

While the police officers in the case at bar spoke with the child's mother as well as to a nurse, and the child here is a year older than the two-year-old in *Cortez*, the facts here are otherwise indistinguishable from those in *Cortez*. The information relied upon in this case likewise was not sufficiently trustworthy to justify the seizure. It appears that the district court's finding that probable cause existed was likely based more upon the type of crime allegedly committed and the difficulty of detecting such crimes, rather than upon the objective evidence available. There is no doubt that

---

[6]There is no evidence in this case that the police even considered interviewing the three-year-old child before arresting Shaw, despite the fact that interviewing the alleged victim of child sexual abuse is apparently common practice, judging from each of the cases cited above. Consequently, the dissent's contention that "[n]one of the litigants in this case . . . thought that it would have been wise for the police officers in uniform to add to the child's trauma by interviewing him personally," is simply irrelevant.

[7]Judge Sutton's statement that "hearsay testimony by itself may establish probable cause," which leads to his conclusion that probable cause existed in this case, overly simplifies the case law in this arena. As indicated above, hearsay testimony alone *may* establish probable cause "*so long as a substantial basis for crediting the hearsay is presented.*" *Gates*, 462 U.S. at 241–42. Again, the police in this case conducted no investigation and presented no basis whatsoever for crediting the hearsay.

child sexual molestation is a particularly troubling crime and one that is notoriously difficult to detect. Notwithstanding, it is beyond question that a defendant's Fourth Amendment rights are not suspended when he is suspected of committing murder, rape or any number of other heinous crimes. Likewise, they should not be disregarded simply because he is suspected of committing the crime of child sexual abuse. Clearly, the mother's allegation warranted additional investigation into the claim. Such investigation should have occurred, however, *prior* to arresting Shaw.

Although the Government has not explicitly asked us to adopt a categorical rule, we see no way to affirm the district court's finding of probable cause in this case without carving out what would amount to an exception to the probable-cause requirement in child-molestation cases. We decline to adopt such an exception. At the same time, our opinion should not be read as holding that an accusation of child molestation reported to authorities by a parent will never suffice to establish probable cause. Nor are we holding that a child victim of sexual abuse must in every case be interviewed by police in order to establish probable cause. Shaw has not advocated any such rule, and we need not adopt one to find that the detention at issue was not based on probable cause. We hold only that the mother's bare-bones hearsay accusation in this case, with no corroborating evidence, did not suffice to establish probable cause, and that the ensuing arrest was therefore unlawful.[8]

### 3. Intervening Circumstances

The next question is whether the statements Shaw made while in custody, notwithstanding the absence of probable cause to arrest him, were sufficiently voluntary to overcome the taint of illegality such that suppression of the statements is not required.

Supreme Court precedent is clear: A confession "obtained by exploitation of an illegal arrest" may not be used against a criminal defendant, *Brown v. Illinois*, 422 U.S. 590, 603 (1975), *unless* such confession results from "an intervening independent act of a free will" sufficient to purge the primary taint of the unlawful invasion. *Wong Sun v. United States*, 371 U.S. 471, 486 (1963) (internal quotation marks and citation omitted). The "question in such a case is whether . . . the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (internal quotation marks and citation omitted); *see also Brown*, 422 U.S. at 602 (quoting *Wong Sun*). "Dissipation of the taint resulting from an [illegality] ordinarily involves showing that there was some significant intervening time, space or event." *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990). Demonstrating such "purgation" is, of course, a function of circumstantial evidence, with the burden of persuasion on the State. *Brown*, 422 U.S. at 604.

The "threshold requirement" for admissibility of a confession tainted by illegality is that the confession must have been voluntary for purposes of the Fifth Amendment. *Id.* If the confession was not voluntary, it must be excluded and no further inquiry is necessary. If it was voluntary, then the court must consider additional factors to determine whether the statement is admissible, including "the temporal proximity of the illegal conduct to the statements, the presence of any intervening circumstances, and . . . the purpose and flagrancy of the police misconduct." *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003).

The district court did not reach the issue of attenuation because it found that Shaw's arrest was supported by probable cause and therefore was not illegal. If disputed questions of fact were involved, we would be required to remand to the district court for the initial consideration of this

---

[8]Contrary to Judge Sutton's contention, our decision here does not increase Fourth Amendment protections in the context of child-sexual-abuse cases. The dissent fails to recognize that this case does not involve eye-witness testimony but, rather, unsubstantiated hearsay.

issue. Because the facts are adequately developed, remand is not required. *Cf. Brown*, 422 U.S. at 604 ("Although the Illinois courts failed to undertake the inquiry mandated by *Wong Sun* to evaluate the circumstances of this case in the light of the policy served by the exclusionary rule, the trial resulted in a record of amply sufficient detail and depth from which the determination may be made.").

In support of its attenuation argument, the United States points out that Shaw signed a *Miranda* waiver twice, thus making his confessions "voluntary" for Fifth Amendment purposes. In addition, the government contends that (1) the amount of time that passed between Shaw's arrival at the CID office and the statements given supports a finding that the statements were voluntary;[9] (2) "intervening circumstances" served to attenuate the connection between the alleged police misconduct and the incriminating statements, in that the police obtained additional information to support the initial arrest; and (3) the conditions of Shaw's detention were "exceptionally mild" and there was no flagrant police misconduct. Shaw contests each of these arguments.

> a.      *Voluntariness of the Confessions*

Although Shaw signed the *Miranda* waiver form twice, he argues that the statements he gave were not truly voluntary given the coercive conditions of his detention (particularly the length of time of his detention and interrogations), his especially suggestible nature (as indicated by expert testimony), and the fact that he did not fully appreciate his right to silence (again, as expert evidence suggested). The trial court found that Shaw knowingly and intelligently signed the *Miranda* forms, and his failure fully to understand the import of the forms did not make his statements involuntary for Fifth Amendment purposes. The trial court heard and weighed the evidence at the hearing in this regard, and did not commit clear error in finding that Shaw's statements were voluntary for Fifth Amendment purposes. *Cf. Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (noting that a confession is "voluntary" for purposes of the Fifth Amendment if *Miranda* warnings were given and understood). If the statements were not voluntary for Fifth Amendment purposes, our inquiry would end here with a necessary finding that the statements must be excluded. Because they were voluntary, the threshold requirement is met, and we must consider the other factors outlined by the Supreme Court in *Brown*.

> b.      *Temporal Proximity*

As Justice Stevens stated in his concurrence in *Dunaway*, 442 U.S. at 220, "[t]he temporal relationship between the arrest and the confession may be an ambiguous factor. If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one." Thus, the "temporal proximity" factor must be considered in light of the conditions and circumstances that occurred during the time frame in question. "Otherwise, determining whether the length of time separating evidence or a statement from a Fourth Amendment violation tends to purge the taint of the illegality is a fruitless endeavor." *United States v. Robinson*, 932 F. Supp. 1271, 1280 (D.N.M. 1996) (citing *United States v. Mendoza-Salgado*, 964 F.2d 993, 1012 (10th Cir. 1992)).

The fact that both parties seem confused as to whether the passage of a greater or lesser amount of time would help their respective positions supports Justice Stevens' assessment regarding the ambiguity of this factor. In any event, the fact that nearly six hours passed between the initial detention and the first written statement, and another twelve hours passed before the next written statement, is not dispositive. *See, e.g.*, *Brown*, 422 U.S. at 604–05 (noting that Brown's first

---

[9]The government argues that only a short period of time passed between Shaw's initial detention and his first "statement," as he arrived at the CID office between 2:00 and 2:45 a.m. and signed his "first statement" at 3:10 a.m. In fact, Shaw only signed the Miranda waiver at 3:10 a.m. He signed his first confession statement around 7:45 a.m.

confession occurred less than two hours after his illegal arrest, during which time "there was no intervening event of significance whatsoever," and that his second statement, given approximately six hours later, "was clearly the result and the fruit of the first"); *United States v. Wolfe*, 166 Fed. Appx. 228, 234 (6th Cir. Feb. 14, 2006) (unreported) (noting that "there is no 'bright-line' test for temporal proximity," and finding the ten-hour detention at issue in that case to be "within the ambit" of that in *Taylor v. Alabama*, which involved a six-hour detention, and determining that the temporal factor must be considered in conjunction with any intervening circumstances (citing *Reed*, 349 F.3d at 464)); *United States v. Baldwin*, 114 Fed. Appx. 675, 684 (6th Cir. Nov. 12, 2004) (unreported) (affirming suppression of the defendant's statements, finding that a two-month interval between defendant's arrest and a second statement did not, standing alone, favor admission of the statement); *United States v. Webster*, 750 F.2d 307, 325 (5th Cir. 1984) (holding that a defendant's second statement, given approximately ten hours after an initial statement, was the fruit of the illegal arrest where the defendant was "in continuous custody, did not consult with a lawyer, was not able to contact family or friends, was not brought before a neutral magistrate, had likely been without sleep for a long period, and had already given one tainted statement").

The length of the detention in this case suggests that it likely had exploitative and coercive effects. Shaw was left alone for just a short period of time before Wolfington began interrogating him. Wolfington was with him continuously for at least five hours until Shaw signed his first statement at 7:43 a.m., having been up all night. He had been permitted bathroom and smoke breaks but had not slept or eaten during that time. After giving the statement he was allowed to sleep or rest for a few hours, though he refused food, before being taken to give a blood sample (for reasons that were never made clear). The second round of interrogation started shortly thereafter, and there was no time at all between the second and third statements. Thus, the length of the detention, and particularly the fact that Shaw was interrogated for approximately eleven of the twenty hours he was held, does not weigh in favor of the Government's argument.

####                    c.        *Intervening Circumstances*

As the Government acknowledges, "[t]he type of intervening events that serve to attenuate police misconduct are those that sever the causal connection between the illegal arrest and the discovery of the evidence." *Reed*, 349 F.3d at 464. The Government, citing *Rawlings v. Kentucky*, 448 U.S. 98 (1980), argues that the post-arrest discovery of other incriminating evidence implicating a defendant can be such an intervening circumstance, and that such incriminating evidence was discovered in this case.

The facts in *Rawlings* are distinguishable, however. In *Rawlings*, police, armed with an arrest warrant for a man named Marquess, arrived at his house to effect that arrest. When they arrived at the house, another resident of the house and four visitors were there, including Rawlings. Marquess was not there. Because the police smelled marijuana smoke and saw marijuana seeds, two of the officers left to obtain a warrant to search the house. In the meanwhile, the remaining officers detained those persons in the house, allowing them to leave only if they consented to a body search. About forty-five minutes later, the officers returned with a warrant authorizing them to search the house. At that point, police read the warrant aloud and also read *Miranda* warnings. Police then ordered one of the visitors to empty her purse onto a small table, which she did. Among the items in the purse were a jar containing LSD tablets and a number of small vials containing other controlled substances. The owner of the purse turned to petitioner and told him "to take what was his." *Rawlings*, 448 U.S. at 101. Petitioner Rawlings immediately claimed ownership of the controlled substances. Rawlings later claimed that the search of the purse was illegal and his admission of ownership of the drugs was the fruit of an illegal detention that began when police refused to let the occupants of the house leave unless they consented to a search. On review, the Court held Rawlings had no standing to contest the search of a purse that did not belong to him, and that, even assuming the detention had violated his constitutional rights, the "petitioner's admissions

were apparently spontaneous reactions to the discovery of his drugs in Cox's purse" and were unrelated to the terms of his arguably illegal detention while awaiting the search warrant. *Id.* at 108 & 109. Although *Rawlings* has on occasion been cited in *dicta* as support for the proposition that the discovery of other incriminating evidence can be an intervening circumstance, *see, e.g.*, *Wolfe*, 166 Fed. Appx. at 235; *Baldwin*, 114 Fed. Appx. at 684, that was not the Supreme Court's actual holding.

No such intervening spontaneous action occurred here. Instead, the police simply interviewed the parents of the children—in other words, they began to conduct the type of investigation they should have done before arresting Shaw. These interviews, conducted at the same time Shaw was being interrogated, turned up additional evidence almost as equivocal as the original basis for Shaw's arrest. Regardless of how probative it was, however, this type of post-arrest discovery of new evidence simply cannot, under the circumstances presented here, constitute an intervening circumstance that would break the causal connection between the illegal arrest and the subsequent confessions, particularly given that neither Shaw nor his interrogators knew about the alleged new evidence.[10] *Cf. Wong Sun*, 371 U.S. at 491 (intervening circumstance found where the confession was made several days after the illegal arrest and was preceded by arraignment and release from custody); *United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997) (intervening circumstance found where there was a proper arrest on unrelated charges following the initial illegal arrest); *United States v. Fazio*, 914 F.2d 950, 958 & n.12 (7th Cir. 1990) (intervening circumstance found when the defendant was never actually in custody and freely agreed to speak to police at a site away from scene of his illegal arrest and drove his own vehicle to the meeting); *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1300 (9th Cir. 1988) (noting examples of intervening circumstances as including a defendant's subsequent release from custody, appearance before a magistrate, discussions with counsel, or subsequent convictions on unrelated charges).

### d.    Police Misconduct

The final factor in the *Brown* analysis—the purpose and flagrancy of the official misconduct—is in many cases the most important because "it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct." *Reed*, 349 F.3d at 464–65 (citations omitted). The Government argues that there was no flagrant police misconduct in this case. In particular, the Government claims that the purpose of bringing Shaw to the CID office was to talk to him away from the children's environment and that police "would have made other arrangements" if Shaw had refused to go. (Appellee's Brief at 43.) The Government insists that this case is distinguishable from cases in which the purpose of the unlawful detention was for police to interrogate a suspect "in the hope that something might turn up." (*Id.* (citing *Taylor*, 457 U.S. at 693; *Dunaway*, 442 U.S. at 202; *Brown*, 422 U.S. at 605).)

Regardless of whether the officers were sympathetic to Shaw's cousin's family and hoped to assist them in avoiding further contact with Shaw, the fact remains that the primary purpose of bringing Shaw into the CID office was to question him for investigative purposes, precisely in the

---

[10]Cases that have held that additional evidence arising after an arrest may justify a subsequent search or interrogation are distinguishable, as they have generally involved independent evidence of a completely separate crime, and the police have been in possession of such evidence *prior* to initiating the challenged search or interrogation, not after it has already begun. *See, e.g.*, *United States v. Manuel*, 706 F.2d 908, 911–12 (9th Cir.1983) (distinguishing the facts of the case from those in *Brown v. Illinois* and *Dunaway v. New York*, because, although the defendant's arrest for murder was ordered prematurely, by the time the police officers actually located and arrested him, they plainly had probable cause to arrest him for the crime of assault; likewise, probable cause was "amply established" by the time police began interrogating him); *United States v. Nooks*, 446 F.2d 1283, 1288 (5th Cir. 1971) (where the original detention of the defendant might have been illegal because of the absence of probable cause, the search at issue was nonetheless permissible because by the time it occurred, probable cause of a new and distinct crime—flight from and shooting at the police—clearly existed).

hope that something might turn up. The fact that Shaw was not physically abused, mistreated or threatened, while relevant, still does not dispel the taint of illegality in this case, because "purposeful and flagrant" misconduct is not limited to situations where the police act in an outright threatening or coercive manner similar to what occurred in *Brown*. *See Dunaway*, 442 U.S. at 218–19 (rejecting the attempt to distinguish *Brown* on the grounds that the police did not threaten or abuse the defendant and were highly protective of the defendant's Fifth and Sixth Amendment rights). In both *Dunaway* and *Taylor* the police interrogated the defendants without incident, and yet the Supreme Court held that the actions of the police still had the sort of "quality of purposefulness" condemned in *Brown*. *Dunaway*, 442 U.S. at 218; *Taylor*, 457 U.S. at 693 (rejecting the State's argument that the police conduct at issue was not "flagrant or purposeful"). As this court has previously observed,

> [c]onducting a custodial interrogation after an illegal arrest in a congenial and non-threatening manner does not in and of itself disprove that the police acted in bad faith. Unwarranted detentions following illegal seizures may demonstrate the type of purposeful and flagrant conduct the exclusionary rule was designed to prevent, especially if the police lack an arguable basis for the detention.

*Reed*, 349 F.3d at 465.

In fact, *Brown* made it clear that the requisite "quality of purposefulness" can be demonstrated when the arrest, in design and execution, is investigatory in nature. Here, as in *Brown*, the police apparently knew they did not have probable cause. If they had, they likely would have formally arrested Shaw to begin with rather than merely bringing him in for investigative questioning. Despite not having probable cause, the police proceeded to conduct a series of custodial interrogations in what can only be described as flagrant disregard for Shaw's Fourth Amendment rights. The bottom line is that the facts of this case are indistinguishable for all practical purposes from those in *Dunaway* and *Taylor*.

The Government has failed to carry its burden of proving that the confessions were sufficiently attenuated from the original illegal arrest to render them admissible, and the Defendant's motion to suppress should have been granted.

## IV. CONCLUSION

We fully comprehend the disturbing nature of the crimes with which the Defendant was charged and the difficulties posed to law enforcement personnel in detecting child sexual abuse. Our holding today simply reaffirms that the fact that a crime may be heinous in nature or difficult to prove does not diminish the protection afforded by the probable-cause standard. Because Shaw was arrested without probable cause, and the confessions Shaw made during his detention were not sufficiently voluntary to eliminate the taint of the illegality of his arrest, the district court's denial of the motion to suppress is reversed and the matter remanded for further proceedings. Given the nature of our holding, we have no need to reach Shaw's remaining arguments on appeal.

---------------

**DISSENT**

---------------

SUTTON, Circuit Judge, dissenting.  I agree with the majority that:

(1) probable cause requires "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [arrestee has] committed or [is] committing an offense," *Beck v. Ohio*, 379 U.S. 89, 91 (1964); Maj. Op. at 7;

(2) a "totality-of-the-circumstances analysis" applies to "probable-cause determinations," *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see* Maj. Op. at 8;

(3) when reviewing the denial of a suppression motion, an "appellate court must consider the evidence in the light most favorable to the government," *United States v. Herndon*, 393 F.3d 665, 667 (6th Cir. 2005) (internal quotation marks omitted); *see* Maj. Op. at 5;

(4) "[a] law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest," *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999); *see United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006); Maj. Op. at 7;

(5) hearsay testimony by itself may establish probable cause, *Gates*, 462 U.S. at 241–42; Maj. Op. at 7; and

(6) the age of this victim (three years old) does not disqualify him from supplying probable-cause evidence that he was sexually abused, Maj. Op. at 8.

If a three year old may tell his mother that he has been sexually molested, if the mother may tell the police about the allegation and if the police may rely on her statement to establish probable cause, as all of this shows, what is it about the circumstances of this case that show probable cause did not exist to arrest Shaw?  Nothing, I respectfully submit.

And plenty shows that the police could fairly find probable cause.  The boy was the only eyewitness to this crime aside from Shaw, as invariably and problematically will be true in a sexual abuse case.  What the boy told his mother amounted to a serious allegation, one that it is difficult to imagine any parent taking lightly.  Shaw plainly had the opportunity to commit the crime because he was the cousin of the victim and was living with the victim's family at the time.  *See Harness*, 453 F.3d at 754–55 (family member "corroborated that the victim was at Harness's house and separated from his brother at the time of the incident, confirming that there was a window of time within which the alleged sexual assault could have occurred") (internal quotation marks omitted).  How the boy described the incident ("he touched my pee pee" and "Mr. Shaw's pee pee touched my butt") is consistent with what a three year old could observe, sense and understand.  *Cf.* Josephine A. Bulkley, *The Impact of New Child Witness Research on Sexual Abuse Prosecutions*, *in* PERSPECTIVES ON CHILDREN'S TESTIMONY 208, 226 (S.J. Ceci ed., 1989) ("[S]tudies indicate that in many cases of child sexual abuse, younger children's honesty combined with lack of cognitive abilities may make them more credible witnesses.").  And of course he was not describing an intricate securities fraud but an incident concerning his body and two body parts that even the most casual toilet training would acquaint him with.

In hearing her son's description of the incident, the mother was as well-positioned as anyone to know whether her son may have misinterpreted what had happened and to know whether her cousin could have (or would have) done such a thing.  The mother believed her son.  She took her

child to the hospital, where he underwent a medical examination and where she shared his statements with others, all of whom took the accusations seriously.

Conspicuously missing from this sequence of events is any evidence that diminishes the likelihood that Shaw committed the crime. Nothing indicates that the boy was a pawn in one spouse's efforts to obtain leverage over the other in the course of a bitter divorce. Nothing indicates that some other form of family tension might have prompted the mother to contrive such a serious allegation. Nothing indicates that this boy lacked the capacity to report this incident truthfully. And the fact that the medical examination of the boy was inconclusive does not undercut the allegations given that there is little reason to think that either of the acts described by the boy would have left any evidence. *See* Joyce A. Adams, *The Role of the Medical Evaluation in Suspected Child Sexual Abuse*, *in* TRUE AND FALSE ALLEGATIONS OF CHILD SEXUAL ABUSE 231, 239 (Tara Ney ed., 1995) ("[T]he child's statement is the most important evidence of molestation. . . . [T]he results of the medical examination will usually be normal or nonspecific . . . the medical examination will rarely be diagnostic of sexual abuse.").

As I read the majority's opinion, it rejects the district court's finding of probable cause on one ground and one ground alone: that the police could not believe the statements of a three year old. I realize the majority disclaims announcing such a bright-line rule, but I cannot see any other reason for the decision. While I share the majority's anxiety about premising an individual's deprivation of liberty on the observations of a three year old, it is well to remember that that is not all that happened. The police interviewed the mother, who knew both the victim and the perpetrator; they interviewed the medical staff; they learned that Shaw had the opportunity and necessary access to the child to commit the crime; and they learned nothing inconsistent with the accusation. And of course we are not being asked to affirm a criminal conviction. We are being asked a question of probabilities—whether a trained law enforcement officer could reasonably believe that Shaw had committed a crime. If the majority is right, the officers not only lacked authority to take Shaw into custody to ask him about the accusations, they also lacked authority to obtain a search warrant (also based on probable cause) of the suspect's room—which seems untenable if, say, the allegations had included sexual abuse involving a physical object or photographs.

Law enforcement, to be sure, may consider the age of the victim in considering other circumstances of the investigation, and particularly any indicia of untrustworthiness, but the status of being a three year old does not as a matter of law discredit the victim's accusations. *See Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1998) (holding that the police could rely upon a three-year-old girl's allegations of sexual abuse (as told to her mother and repeated to the police) in finding probable cause); *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990) (observing that police could rely upon a four-year-old girl's allegations of sexual abuse in finding probable cause); *Myers v. Morris*, 810 F.2d 1437, 1456–57 (8th Cir. 1987) (holding that police could rely upon the sexual-abuse allegations of two children (ages five and twelve) in finding probable cause), *cert. denied* 484 U.S. 828 (1987), *overruled on other grounds by Burns v. Reed*, 500 U.S. 478 (1991); *cf.* 18 U.S.C. § 3509(c)(2), (4) ("A child is presumed to be competent. . . . A child's age alone is not a compelling reason" to hold a competency hearing.).

*Cortez v. McCauley*, 438 F.3d 980 (10th Cir. 2006), does not prompt a different conclusion. The child victim in that case was two years old, which proves only that there may be an age (perhaps two and younger is it) when children lack the capacity both to understand what has happened to them and to describe it accurately. But nothing in *Cortez*, nothing in the majority's opinion, nothing in the defendant's briefs and nothing that I have been able to find on my own says that three year olds as a group lack the capacity to tell a parent that someone "touched my pee pee." Until we have such evidence, I am hard pressed to understand why police—who are better equipped to assess the veracity of witnesses than appellate judges are—may not consider such accusations in making probable cause determinations. No less importantly, the police in *Cortez* spoke only to a nurse over

the phone, who relayed the mother's statement relaying the child's statement. Here, by contrast, the officers interviewed the child's mother and the nurse and spoke to both of them in person. In *Cortez*, in short, there was no "totality" of circumstances, just one circumstance—a phone conversation with a nurse who had presumably met the child for the first time just hours before. I have no problem with the outcome in *Cortez*; I just find it of little assistance here.

Nor may we reverse the district court's decision on the ground that the officers could have taken other investigatory steps to confirm their suspicions by, say, arranging for a child psychologist to interview the victim. Perhaps if the police and family could have ensured that Shaw would be separated from the victim while they arranged for a psychological interview (remember that Shaw was living in the victim's home), this option would have made considerable sense and would have been a preferable police practice. But that is not the inquiry precedent tells us to make. "Once probable cause is established," we have explained, "an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused . . . nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Ahlers*, 188 F.3d at 371 (internal quotation marks and citations omitted). It bears adding that none of the litigants in this case, quite understandably, thought that it would have been wise for the police officers in uniform to add to the child's trauma by interviewing him personally. *See* Oral Arg. Tr. (In response to this precise question, Shaw's appellate attorney stated: "I have a two-and-a-half year old and I perfectly agree with the court.").

Finally, everyone understands that "a defendant's Fourth Amendment rights are not suspended when he is suspected of committing murder, rape or . . . child sexual abuse." Maj. Op. at 9. My point is not that we should lessen Fourth Amendment protections in child-sexual-abuse cases; it is that we should not *increase* them. In murder and rape cases, one does not need corroborating evidence at the probable-cause stage to support the testimony of someone who witnessed (or experienced) the crime. Eyewitness testimony alone will suffice, unless there is a reason for "the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection." *Ahlers*, 188 F.3d at 370. But in this case the eyewitness testimony does not suffice, the court holds, absent corroborating evidence, and that is true even though there is nothing about the child's accusation suggesting he was mistaken. To say that child-sexual-abuse cases require corroborating evidence thus not only *increases* the Fourth Amendment protections for this one crime but does so for the one type of crime most likely *not to* yield such evidence. I respectfully dissent.