GORSUCH, Circuit Judge,
concurring in part and dissenting in part, joined by HARTZ, O’BRIEN, TYMKOVICH, and HOLMES, Circuit Judges, and joined in Part I.b by McCONNELL, Circuit Judge.
The narrow issue that moved us to grant en banc review was the panel’s assertion that when a case contains claims for both an unlawful seizure and excessive force arising under the Fourth Amendment, the latter claim must always be subsumed *1138 within and resolved in like fashion as the former claim. See Order, Cortez v. McCauley, No. 04-2062, at 2 (10th Cir. May 4, 2006) (unpub.). After sweeping aside the panel’s proffered rule, the majority proceeds to devote the bulk of its efforts to the task of applying more or less settled Fourth Amendment legal principles to the facts of this particular case. While I agree with much of the Court’s analysis, in certain respects I regret that I am unable to do so.
First, the majority finds that no probable cause existed to support the defendants’ arrest of Mr. Cortez; while I concur with the result the majority reaches on this score, I cannot entirely agree with all of the reasoning the majority appears to employ. Second, the majority denies qualified immunity on Mr. Cortez’s seizure claim but fails to cite authority which, I believe, reasonably could have provided notice to law enforcement officers of the illegality of their actions. Third, the majority’s analysis of Ms. Cortez’s excessive force claim — relying solely on her detention and temporary feeling of intimidation — is without precedent in our case law and seems to suggest that nearly any unlawful seizure may now give rise to an unlawful use of force claim in our circuit.
I
When a defendant asserts qualified immunity at summary judgment, the plaintiff must clear two hurdles. First, he or she must demonstrate that the defendant violated a constitutional or statutory right of the plaintiff. Second, the plaintiff must also show that the infringed right at issue was sufficiently clearly established at the time of the allegedly unlawful activity that a reasonable law enforcement officer would have known that his or her challenged conduct was illegal. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In undertaking this analysis, the Court has repeatedly warned us against “unrealistic second-guessing” of police judgments, United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), and has instructed us to proceed “from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,” taking account of “the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving.” See Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In my view, the majority errs in certain respects at both steps of the Saucier analysis of Mr. Cortez’s unlawful detention claim.
a. Today, the majority announces a new rule of law at Saucier’s first step— namely, that a statement of a two-year-old victim identifying the perpetrator of a sexual assault, at least when transmitted through third parties, is insufficient to supply probable cause for an arrest. While one could question the wisdom of such a rule,[2]1 do not disagree with the result the majority reaches. This case differs from our decision in Easton v. City of Boulder, 776 F.2d 1441, 1449 (10th Cir.1985), in important respects: here, there was only one victim and therefore no corroboration from two different accounts; the child was younger, indeed barely past the age of language acquisition; and the statement that Mr. Cortez “hurt [the child’s] pee pee” was ambiguous in that, while it certainly could suggest sexual abuse, it also *1139 was susceptible to a sexually-neutral application. For these reasons, I accept the majority’s conclusion, Maj. Op. at 1116-17, that, under the totality of the circumstances, there was no probable cause for Mr. Cortez’s arrest.
After announcing its conclusion on this score, however, the majority broadens its critique of the quantity and quality of the evidence before the officers later in its opinion, Maj. Op. at 1117-22; while written primarily in the context of Saucier step two, the analysis in this portion of the Court’s opinion appears to inform its conclusion at Saucier step one as well. But whether most pertinent to Saucier step one or step two (or perhaps both), I find certain aspects of the majority’s discussion problematic and am thus unable to join this portion of the Court’s opinion.
First, the majority enumerates a laundry list of things the officers might have done, but did not do, to corroborate the child’s statement in this case. Maj. Op. at 1117. Indeed, the majority summarizes its complaint with the offieers’s conduct as involving “a need for more pre-arrest investigation.” Maj. Op. at 1116. While I do not doubt for a moment that additional investigation would have been a good idea, asking whether the officers might’ve, could’ve, or should’ve done more investigation before effecting an arrest is not the test for evaluating whether probable cause existed at the time of the arrest. We have never previously imposed upon officers a duty to investigate certain leads we think, in retrospect and with the benefit of hindsight, might have been warranted or wise before making an arrest. Rather, precedent instructs us to examine what the officers actually did, asking whether, on the facts they had before them, probable cause was or was not present. See, e.g., Graham, 490 U.S. at 396, 109 S.Ct. 1865. As we put the point in United States v. Gordon, “[t]o determine if probable cause existed for a warrantless arrest, we examine if, at the time of arrest, the facts and circumstances ivithin the officer’s knowledge and of which the officer had reasonably trustworthy information were sufficient to warrant a prudent officer in believing the defendant had committed or was committing a crime.” 173 F.3d 761, 766 (10th Cir.1999) (emphases added).[3] The majority’s hypothesizing about what the officers could have done, or what type of investigation they should have undertaken seems to me to be the very type of second-guessing that the Supreme Court has repeatedly cautioned us against. See supra p. 1112.[4]
*1140 Second, the majority stresses that the putative victim’s statement identifying Mr. Cortez as the perpetrator did not come directly from the child, but through a hospital official to whom the alleged victim’s mother had conveyed the statement. The majority goes so far as to say that it would be “patently obvious” to any reasonable officer that “unsubstantiated double-hearsay originating from a two-year-old, standing alone, does not give rise to probable cause.” Maj. Op. at 1118-19. But, while in some places the majority criticizes the officers’ reliance on hearsay, in others the majority asserts that “[t]he fact that hearsay evidence would not be admissible at trial to prove guilt does not make it unusable as a source of probable cause for a warrantless arrest.” Id. at 1117-18. And, in fact, the courtroom’s refined rules of evidence have never governed hardscrabble investigative police work occurring in real time. To the contrary, the law has always been that an arresting officer may rely on hearsay, even multiple layers of hearsay, in establishing probable cause when the hearsay has some indicia of reliability. See United States v. Mathis, 357 F.3d 1200, 1205 (10th Cir.2004) (“We restate that multiple layers of hearsay may form the basis of a finding of probable cause.”); United States v. Monaco, 700 F.2d 577, 580 (10th Cir.1983) (“A search warrant can be predicated upon an affidavit containing direct observations of police officers or hearsay from a reliable source or informant.”); see also United States v. Corral, 970 F.2d 719, 727 (10th Cir.1992).
Third, the majority characterizes the police as having no facts before them supporting the reliability of the child’s hearsay complaint at the time of Mr. Cortez’s arrest. Maj. Op. at 1117-20. But this simply isn’t so. The officers had a mother — the one person in the world who we can reasonably assume best knew the child — acting in a manner suggesting that she believed a crime had occurred: she, along with the child’s godfather, took the child to the hospital for an extraordinary, middle-of-the-night pelvic exam. See Appellants’ App. at 55, 58, 99.[5] The officers also knew that hospital authorities had reported the child’s allegations pursuant to their duty to disclose incidents of suspected child abuse. See id.; N.M. Stat. § 32A-4-3(A) (“Every person ... who knows or has reasonable suspicion that a child is an abused or a neglected child shall report the matter immediately to ... a local law enforcement agency .... ” (emphasis added)). And the officers knew, as the majority concedes, that they were “investigating a serious felony” and needed to take “quick action to separate the accused from any other children that might be in the home.” See Maj. Op. at 1129. Indeed, *1141 New Mexico law required the police to take immediate action on receipt of a child abuse claim, thus placing the officers in something of a Catch-22: wait for more evidence and risk violating state law or act quickly and risk a federal lawsuit. See N.M. Stat. § 32A-4-3(C) (“The recipient of a report under Subsection A of this section shall take immediate steps to ensure prompt investigation of the report. The investigation shall ensure that immediate steps are taken to protect the health or welfare of the alleged abused or neglected child, as well as that of any other child under the same care who may be in danger of abuse or neglect.” (emphases added)). Finally, the description the child offered of the event (alleging that Mr. Cortez “hurt her pee pee,” see Appellants’ App. at 58), could be consistent with (even if not exclusively determinative of) how a young child would perceive and report a sexual assault.[6]
Thus, while I agree that the arrest of Mr. Cortez lacked probable cause, I do so for the limited reasons stated above and am unable to join the majority’s reasoning.
b. With regard to the majority’s conclusion at the second step of Saucier, I feel compelled to dissent. The qualified immunity doctrine embodied in this portion of the Saucier analysis is intended to protect diligent law enforcement officers, in appropriate cases, from the whipsaw of tort lawsuits seeking money damages arising from their conduct effectuating their sworn obligation to intervene in aid of public safety, often on a moment’s notice with little opportunity for reflection and based on incomplete information. See supra p. 1112. Before a law enforcement officer may be held financially liable, the Supreme Court requires a plaintiff to establish not only that his or her rights were violated but also that those rights were “sufficiently clear that a reasonable official would understand that what he is doing violates th[em].” Saucier, 533 U.S. at 202, 121 S.Ct. 2151; supra p. 1112. See also Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (qualified immunity should protect “all but the plainly incompetent or those who knowingly violate the law”). Accordingly, we have held that, in order for liability to be imposed, “there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.” Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir.1992).
The opinion for the Court fails to adhere fully to these principles. What exactly would have put the officers on clear notice that relying on a two-year-old’s statement to support the arrest of Mr. Cortez was impermissible? Previously, we have held that when a victim of a crime identifies the perpetrator, police may rely on that information, standing alone, to supply probable cause for an arrest unless they have some reason to think that the statement was not trustworthy. See Easton, 776 F.2d at 1449.[7] This traditional rule plays a particularly vital role in the context of sexual assaults on children as the child victim is *1142 usually the only person with knowledge of the assault. See id. (noting that it is “entirely unacceptable” to presume child sexual abuse victim statements to be unreliable and that “[i]n a great many child molestation cases, the only available evidence that a crime has been committed is the testimony of children”); cf. Gerald M. v. Conneely, 858 F.2d 378, 381 (7th Cir.1988) (upholding probable cause for a detention based on the uncorroborated statement of ten-year-old victim (and only witness) of an alleged theft and noting that “[t]en-year-olds are capable of being more truthful than some adults”).
To be sure, as I have acknowledged, Easton can be distinguished from the facts at hand, and I agree with the majority that the probable cause calculus in this case ultimately and properly ends in a different result than the one reached in Easton. See supra p. 1113. But I can hardly blame law enforcement officers for having failed to divine our outcome on that score while busy responding to a call reporting an alleged child molestation. In Easton, we held that even at-times inconsistent victim statements of a three-year-old and a five-year-old regarding a sexual assault were sufficient to provide the officers in that case with probable cause for an arrest. 776 F.2d at 1449-50. A reasonable officer quite easily could have concluded from this holding and the background law concerning victim statements generally that a statement emanating from the victim of an alleged sexual assault, with little more, is sufficient to supply probable cause. The Easton panel itself expressly noted that the police officers “had probable cause at [the] time” they completed their interviews with the victims, and thus did not need to await the results of any additional investigation before making an arrest. Id. at 1451. It is a whipsaw indeed to move from this conclusion in Easton to the conclusion the Court offers today at Saucier step two — that any reasonable officer clearly should have known from our case law that an arrest based solely on the statement of a two-year-old victim was illegal.[8]
To support its conclusion at Saucier step two, the majority advances a number of arguments discussed already which I find unpersuasive whether best directed at step one or, as it submits, step two of the Saucier sequence. See supra pp. 1113-15. The majority then proceeds to identify authority that, it asserts, put the officers on clear notice of the illegality of their con *1143 duct. It begins this latter discussion, however, with what amounts to a rather telling admission: “Even without prior caselaw on point ... we would harbor no qualms concluding, based solely on cases like [Tennessee v.] Garner [,471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985),] and [United States v.] Watson [,423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)], that the officers were on reasonable notice that their actions ran afoul of the Fourth Amendment.” Maj. Op. at 1118-19. Beginning with a disclaimer about the absence of case law seems to indicate that there isn’t any “pri- or caselaw on point” clearly notifying officers that their conduct was wrongful; citing Gamer and Watson only serves to confirm that conclusion. Both are old chestnuts holding simply that probable cause is required to effectuate a lawful arrest. Suggesting that they somehow put officers on notice that their conduct in this case was improper falls squarely into a trap the Supreme Court has warned us against: relying on sweeping and generic pronouncements of the law instead of identifying prior authority fairly putting officers on notice that their actions were illegal. See generally Brosseau v. Haugen, 543 U.S. 194, 201, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (holding that the court of appeals mistakenly relied on Gamer and Graham in finding use of excessive force clearly established where facts fell within a “hazy border between acceptable and excessive force” (internal quotation omitted)); id. at 199, 125 S.Ct. 596 (“Graham and Gamer, following the lead of the Fourth Amendment’s text, are cast at a high level of generality. Of course in an obvious case, these standards can ‘clearly establish’ the answer, even without a body of relevant case law. The present case is far from the obvious one where Graham and Gamer alone offer a basis for decision.” (internal citations omitted)).
Further, while the plaintiff bears the burden of citing to us what he thinks constitutes clearly established law showing the defendants’ conduct was unlawful, see Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir.1995), Mr. Cortez refers us to only a single case — Romero v. Fay, 45 F.3d 1472 (10th Cir.1995) — and that case may do Mr. Cortez more harm than good. Romero nowhere rejected, and doesn’t even discuss, our rule that the word of the victim, as reliably relayed through third parties, is typically enough to establish probable cause. See id at 1476-78. Rather, Romero held that an officer had probable cause to arrest the defendant based on information provided by two individuals who were not even witnesses to the alleged crime, but who had seen earlier events. Id. at 1473-74, 1476-77. Romero further held that the officer was not required to interview the plaintiffs alleged alibi witnesses. Id. at 1476-77. To be sure, in dicta cited by the majority, Romero speaks of the importance of interviewing witnesses readily available at the scene of a crime, but it doesn’t talk of, let alone impose, a duty to interview witnesses located elsewhere (such as at a hospital) before making an arrest.[9]
Trying to fill the void left by plaintiff, the majority cites to Baptiste v. J.C. Penney Co., 147 F.3d 1252 (10th Cir.1998), and United States v. Shaw, 464 F.3d 615 (6th Cir.2006). Neither does much to aid Mr. Cortez’s cause. In Baptiste, the arresting *1144 officers based the decision to arrest an alleged shoplifter on statements made by store security guards. See 147 F.3d at 1256-57. Yet, before making the arrest the officers also viewed the store’s video recording clearly showing the plaintiff purchasing, not shoplifting, the trinket at issue. See id. Rather unremarkably, we held that officers cannot expect qualified immunity for making an arrest after they have viewed with their own eyes a video recording showing that the plaintiff committed no crime. Id. at 1257. Meanwhile, Shaw was decided only months ago and thus could not possibly have put the defendants before us on notice of the illegality of their conduct in 2001. Moreover, Shaw relied heavily for its result on the now-vacated panel opinion in this case and cited nothing to suggest that, as of the time of the events in question here, it was clearly established that a two-year-old victim’s statement was insufficient to support probable cause. See 464 F.3d at 625-26. Thus, neither case could have overturned long standing case law allowing police to rely on statements by victims of crime against their own persons, nor could they have imposed on police (as the majority seems to do) an obligation to investigate other leads even in the presence of such a statement.
Underscoring the absence of any authority putting the officers on clear notice of the illegality of their seizure of Mr. Cortez is the overwhelming authority establishing the illegality of Ms. Cortez’s detention. Here is a genuine instance where no reasonable officer possibly could have thought his conduct was acceptable and thus protected by qualified immunity doctrine. Any good officer knows, after all, that he or she may not, as the officers did with respect to Ms. Cortez, enter the sanctum of a person’s home to effect a seizure without a warrant or probable cause and the presence of exigent circumstances. The Supreme Court has expressly and for many years said exactly that. See Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (“[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.”); Kirk v. Louisiana, 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002) (“As Payton makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.”).[10] Such clear statements from established case law are what our decisions hold are necessary before a court may abrogate qualified immunity at Saucier step two; it is exactly these types of statements which, in the context of Mr. Cortez, are conspicuously missing.[11]
*1145 II
Since the Supreme Court’s command in Graham that excessive force claims arising from a seizure are to be analyzed under the Fourth Amendment rather than through some other (e.g., Fourteenth Amendment) constitutional lens, Graham, 490 U.S. at 394-95, 109 S.Ct. 1865, the courts of appeals have struggled to define the nature and quantum of the force required to state a claim.[12] We have been instructed that “[n]ot every push or shove” should give rise to a constitutional excessive force claim, id. at 396, 109 S.Ct. 1865 (internal quotation omitted), but have otherwise been left (at least for the time being) by the Supreme Court to our own devices to sort out the post-Graham legal landscape. I agree with the majority’s ultimate conclusion that the mere handcuffing of Mr. Cortez — without any further allegation of injury — is insufficient to state a claim for excessive force notwithstanding the illegality of his arrest. In my view, however, the level of force used in the investigative detention of Ms. Cortez — escorting her by the arm from her house and keeping her in a locked police car for an hour with use of an officer’s cell phone— also does not rise to the level of an actionable claim for excessive force under the governing case law.[13]
a. Tellingly, neither Ms. Cortez nor the majority point to a single case allowing an independent claim for excessive force to proceed under remotely analogous circumstances. The cases in which courts have held a non-physical injury sufficient to state a claim for excessive force typically involve the use of grave force and at least the threat of imminent and severe physical harm. For example, a panel of our Court in Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179 (10th Cir.2001), found excessive force where, among other things, a SWAT team member in the course of a raid chased down a four-year-old girl with a high-powered firearm and a laser sight trained on her back despite the fact she posed no threat whatsoever. See id. at 1184, 1197. Similarly, in Tekle ex rel. Tekle v. United States, 457 F.3d 1088, 1095-96 (9th Cir.2006), the court held that the use of handcuffs and guns pointed at a cooperative eleven-year-old boy not suspected of a crime (and who was picked up by the chain of the cuffs) were sufficient to support a jury finding of excessive force. And in McDonald by McDonald v. Haskins, 966 F.2d 292, 295 (7th Cir.1992), the court held that pointing a gun at the head of a nine-year-old boy and threatening to shoot during a search of the boy’s parents’ apartment stated a claim for excessive force. See also Baker v. Monroe Twp., 50 *1146 F.3d 1186, 1193 (3d Cir.1995) (holding that an excessive force claim was appropriate where a woman and her minor children approached a house where a search warrant was being carried out, had guns pointed at them, and were handcuffed for up to twenty-five minutes). The facts in the case before us do not come close to rising to the standard suggested by existing case law; indeed, we have routinely dismissed excessive force claims alleging facts far more invasive and threatening than those presented by Ms. Cortez.[14]
The majority appears to rest in some significant measure on the fact that the officers could have conducted Ms. Cortez’s detention in a less intrusive manner or exceeded what was reasonably “necessary.” See Maj. Op. at 1130-31. But it is not the law that officers must always act in the least intrusive manner possible or employ only that force that might be deemed necessary in hindsight; indeed, we have repeatedly held otherwise, explaining that “the Fourth Amendment ‘does not require police to use the least intrusive means in the course of a detention, only reasonable ones.’” Marquez v. City of Albuquerque, 399 F.3d 1216, 1222 (10th Cir.2005) (quoting United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir.1994)) (internal alteration omitted); accord V-1 Oil Co. v. Means, 94 F.3d 1420, 1427 (10th Cir.1996). Here, the officers were arresting Ms. Cortez’s husband in the middle of the night for a serious offense and were questioning her regarding the alleged crime. In these circumstances, the officers’ actions of removing Ms. Cortez from her home in a nonviolent manner and placing her in the back of a police car where she was allowed to use an officer’s cell phone to contact the outside world were, though perhaps not the least intrusive means available to them, within the range of what would be reasonable assuming, as we must at this point, that her seizure was lawful. As such, these circumstances should not give rise to an additional and separate claim for excessive force.[15]
*1147 b. The opinion for the Court also relies heavily on Ms. Cortez’s statement that she felt “intimidated” during the course of her seizure. See Maj. Op. at 1130. The majority appears to interpret Holland as holding that an individual may base an excessive force claim solely on injuries that the majority variously describes as violations of “personal security” or “dignity interests.” See id. at 1131. But Holland merely held that excessive force claims need not be founded exclusively on a claim of physical injury, recognizing that the circumstances of an encounter — there involving the display of deadly force against innocent children — may themselves be so outrageous as to demonstrate excessiveness. See 268 F.3d at 1195 (“We likewise decline to adopt a bright-line standard dictating that force cannot be [constitutionally] excessive unless it leaves visible cuts, bruises, abrasions or scars.”). It was only in the context of so holding that Holland mentioned that “the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests — a person’s sense of security and individual dignity.” Id.
Even assuming arguendo that Holland held the invasion of an individual’s sense-of-security or dignity interests, standing alone, may form the basis of excessive force claims, without reference to the nature of the police encounter, it does not necessarily follow, as the majority seems to imply, that any subjective feeling of intimidation qualifies as a constitutionally sufficient invasion of these interests. In fact, Holland itself expressly rejected the notion that a claim of excessive force could be based solely on intimidating or abusive language. Id. at 1194. In addition, like the plaintiffs in Baker, McDonald, and Te-kle, the plaintiffs in Holland faced the imminent threat of deadly force and egregiously unprofessional police misconduct. Id. at 1192. That situation is not analogous to that of Ms. Cortez, who does nothing to suggest that the officers physically or verbally abused her, or displayed any animus towards her whatsoever. To the contrary, Ms. Cortez was permitted the sense of security that access to the outside world provides when she was allowed to use an officer’s cell phone in the police car.
Finally, to the extent that Holland might (nonetheless) be read as holding that even a trivial physical or psychological injury is sufficient standing alone to prove a claim for excessive force, I would use this en banc proceeding to clarify the matter and hold that, where the facts surrounding a seizure are not themselves patently excessive (such as in Holland itself and other cases cited at pages 1120-21, supra), more than a de minimis injury is required to suggest that the force used was excessive. That is, I do not doubt that, in addition to pointing to the facts of the encounter itself as plaintiffs did in Holland, a plaintiff may seek to prove that the force used by the police was excessive by reference to the extent of the injuries he or she sustained during the encounter.[16] *1148 But establishing excessiveness in this way requires a showing of more than a mere trivial injury. Thus, for example, because handcuffs themselves are not necessarily an excessive use of force in connection with an arrest, a plaintiff must show real and lasting injury in order to prove that the officer used excessive force in the course of applying handcuffs; a temporary or de minimis feeling of discomfort or pain will not suffice. Compare Lyons v. City of Xenia, 417 F.3d 565 (6th Cir.2005), with Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir.1993). See also Graham, 490 U.S. at 396, 109 S.Ct. 1865 (holding that “[n]ot every push or shove” rises to constitutional dimension under the Fourth Amendment (internal quotation omitted)).
In the case before us, the only injury alleged by Ms. Cortez is a temporary sense of intimidation. Whatever else one might say about what sort of injury is sufficient to suggest excessive force, it seems to me that something more than this must be required. Just as a claim for excessive force will not arise from handcuffing in the course of an arrest absent some non-de minimis injury, neither should such a claim arise from a transient feeling of intimidation during an investigative detention. It is helpful in this regard to look to another area of the law where emotional distress to a plaintiff is found actionable: the intentional infliction of emotional distress. Claims asserting only non-physical injury may be stated solely where outrageous conduct causes severe emotional distress. “The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.” Restatement (Second) of Torts § 46 (Comment j). Even in situations where police officers abuse their authority, a plaintiff is nonetheless unable to recover for “mere insults, indignities, or annoyances.” Id. (Comment e) (emphasis added). It seems to me that what is true in the common law tort context should be even more so in the constitutional context.[17]
I also cannot help but ask whether, if the majority allows Ms. Cortez to establish a claim of excessive force based upon her bare allegation that she was intimidated, might this imply the possibility that the use of virtually any force in the course of an unlawful detention, no matter how mild and no matter whether any actual injury occurs, is unconstitutionally excessive? It is, of course, axiomatic that Ms. Cortez will be fully — and quite properly — compensated in her unlawful detention claim for the indignity, humiliation, and sense of invasion associated with being unlawfully seized by the police in her home; her damages will encompass and compensate her as well for the manner and duration of that seizure. But those indignities, real and compensable though they are through an unlawful detention claim, ought not also give rise to an excessive use of force claim *1149 without some indicia of an actual, nontrivial injury to prove the excessiveness. In these circumstances, the majority’s holding appears to conflate two analytically distinct violations of law and double counts the harm done to Ms. Cortez.
c. Even if a constitutional violation did occur here, we would still be required to analyze whether a reasonable officer was on clear notice that the force used against Ms. Cortez was excessive for an investigative detention. Here again, the plaintiff and majority cite us to no case affording officers such notice.[18] Instead, the majority relies on our decisions in Melendez-Garcia and Perdue for the general proposition that officers must be able to articulate justifications for their use of force during investigative detentions. Maj. Op. at 1131. But this is precisely the sort of generic rule that we and the Supreme Court repeatedly have held insufficient to afford sufficient notice to law enforcement. We have repeatedly held, and been instructed, that a court must identify specific law dearly indicating that the sort of conduct at issue constituted excessive force in an otherwise lawful investigative stop at the time it took place, see supra p. 1112; this Ms. Cortez and the majority do not come close to doing, and — given how different the cases are in which officers have been held liable for excessive force — this they cannot do. The majority’s extended discussion of another venerable decision, Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), only serves to drive the point home. Bivens of course established the rule of law that damages may be recovered against federal officers for a violation of constitutional rights. See 403 U.S. at 397, 91 S.Ct. 1999. The Court in Bivens never held — or even hinted — that the mere act of intimidation, without any showing of actual injury, rises to the level of excessive force.[19] That is a new adornment to our law, one that could scarcely have been imagined by any court thirty-five years ago.
* * *
I respectfully dissent to the degree and for the reasons given above.

. See generally United States v. Shaw, 464 F.3d 615, 634 (6th Cir.2006) (Sutton, J., dissenting) ("In murder and rape cases, ... [ejyewitness testimony alone will suffice.... To say that child-sexual-abuse cases require corroborating evidence thus not only increases the Fourth Amendment protections for this one crime but does so for the one type of crime most likely not to yield such evidence.”).

. Indeed, the law books are replete with cases indicating that the fact that officers might have conducted a more thorough investigation does not negate the existence of probable cause. See, e.g., McKinney v. Richland County Sheriff's Dept., 431 F.3d 415, 418-19 (4th Cir.2005) ("The fact that [the officer] did not conduct a more thorough investigation before seeking the arrest warrant does not negate the probable cause established by the victim’s identification.”); Curley v. Village of Suffern, 268 F.3d 65, 70 (2nd Cir.2001) ("We observed that once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest. Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiffs version wrong before arresting him.” (internal alteration and quotation omitted)); Kelley v. Myler, 149 F.3d 641, 647 (7th Cir.1998) ("The inquiry is whether an officer has reasonable grounds on which to act, not whether it was reasonable to conduct further investigation.”).

. The majority cites to United States v. Valenzuela, 365 F.3d 892, 902 (10th Cir.2004), Maj. Op. at 1116, as authority for its contrary view. But Valenzuela simply held that probable cause did not exist based on the totality of the circumstances in that case. Id. at 901. While the court eventually proceeded to observe that the officers "failed to fully investí- *1140 gate the facts” before arresting the defendant, that comment came in dicta as part of a final incredulous observation that "none of the agents ever even asked” the defendant whether she was with the driver of the vehicle carrying drugs. Id. It certainly is not the case that Valenzuela, which spent pages explaining why the officers had no probable cause under the totality of the circumstances, supports the proposition that probable cause does not exist because the officers failed to investigate in ways judges coming to the case after the fact think most effective or sound; indeed, it did not even address Graham, Gordon, or any other authority (some of which is cited in note 2, supra) indicating otherwise.

. Of course, the officers learned later of a possible grudge between Ms. Cortez and the child's mother, and this fact understandably troubles the majority. But this information came to the officers only after Mr. Cortez was seized and thus cannot inform the question whether the officers had probable cause at the time of the seizure, a question we must analyze based on the information the police had at the time of the arrest and not on facts learned later with the benefit of hindsight. See supra p. 1138. (Notably, the officers released Mr. Cortez as soon as they received information calling into question the accuracy of the child’s statement.)

. See Shaw, 464 F.3d at 632 (Sutton, J., dissenting) (quoting Josephine A. Bulkley, The Impact of New Child Witness Research on Sexual Abuse Prosecutions, in Perspectives on Children’s Testimony 208, 226 (S.J. Ceci ed., 1989) ("Studies indicate that in many cases of sexual abuse, younger children’s honesty combined with lack of cognitive abilities may make them more credible witnesses.”) and quoting Joyce A. Adams, The Role of the Medical Evaluation in Suspected Child Abuse, in True and False Allegations of Child Sexual Abuse 231, 239 (Tara Ney ed., 1995) ("[T]he child’s statement is the most important evidence of molestation.... [T]he results of the medical examination will usually be normal or nonspecific ... the medical examination will rarely be diagnostic of sexual abuse.”)).

. See also Curley, 268 F.3d at 70 ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity.” (internal citations omit *1142 ted)); Spiegel v. Cortese, 196 F.3d 717, 723 (7th Cir.1999); Ahlers v. Schebil, 188 F.3d 365, 370 (6th Cir.1999); Torchinsky v. Siwinski, 942 F.2d 257, 262 (4th Cir.1991) ("It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker. Indeed, it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself." (internal citation omitted)); Clay v. Conlee, 815 F.2d 1164, 1168 (8th Cir.1987) (collecting cases).

. The majority charges that such a reading of Easton is possible "only if the facts of cases do not matter.” Maj. Op. at 1121. But of course the facts of Easton matter greatly and, indeed, they inform our analysis and result at Saucier step one in deciding whether probable cause existed for the arrest. But the question at Saucier step two is different; here we are required to ask not how Easton is best read and applied to the case at hand, but whether it clearly precluded, from a reasonable officer’s point of view, the course of conduct taken by law enforcement in this case. My point on this score is simply that, while Easton is not best read to support probable cause in this case, neither did it clearly preclude the officers' apparent view that a victim's hearsay statement-together with certain corroborating facts, see supra pp. 1114— 15 was sufficient to establish probable cause. Recognizing that "[o]ur cases suggest ” a particular result, Maj. Op. at 1122 (emphasis added), simply is not enough at Saucier step two.

. Indeed, Romero’s dicta merely speaks of establishing probable cause through interviewing witnesses at the scene, investigating basic evidence, or 'Otherwise inquiring if a crime has been committed, doing nothing to upset our general rule about the acceptability of relying on victim statements. Lest any doubt remain, in Olsen v. Layton Hills Mall, 312 F.3d 1304 (10th Cir.2002), we subsequently clarified that "none of [the Romero ] factors is dispositive or indeed necessary to the inquiry” into whether probable cause existed for an arrest. Id. at 1312.

. Some courts have suggested that entry of the curtilage of a home, under particular circumstances, to complete a Terry stop that was initiated in a public place does not violate the Fourth Amendment. See, e.g., United States v. Pace, 898 F.2d 1218, 1228-29 (7th Cir.1990). The stop here, however, started in Ms. Cortez's home.

. To be perfectly clear, I do not mean to suggest, as the majority claims, that I would require a "case on all fours” to constitute clearly established law. See Maj. Op. at 1122. Rather, as the majority’s citation to Lanier puts it, what a court must do is identify case law that applies "with obvious clarity to the specific conduct in question” such that a reasonable officer would be on notice that his or her conduct was unlawful. See 520 U.S. at 271, 117 S.Ct. 1219; see also supra p. 1115 (collecting additional authority). It is this, I contend, Mr. Cortez and the majority fail to do. Likewise, I do not remotely suggest that, "because the allegation was made, repeated by others, and acted on by law enforcement personnel, [it] was trustworthy.” Maj. Op. at 1118 n. 10. This characterization not only ignores the corroborating evidence before the officers at the time of their encounter with Mr. Cortez, it also underscores the problem *1145 with the majority's analysis. The question before us in a qualified immunity case is not what, sitting here today with the benefit of hindsight, any one of us thinks sufficiently trustworthy to rise to the level of probable cause. It is what extant law told reasonable police officers in 2001 about their conduct.

. See generally Jill I. Brown, Comment, Defining “Reasonable” Police Conduct: Graham v. Connor and Excessive Force During Arrest, 38 UCLA L.Rev. 1257 (1991); Daniel J. O’Connell, Note, Excessive Force Claims: Is Significant Bodily Injury the Sine Qua Non to Proving A Fourth Amendment Violation?, 58 Fordham L.Rev. 739 (1990).

. Judge Hartz very reasonably questions whether there ought to be separate Fourth Amendment claims for unlawful detention and the excessive use of force rather than a single Fourth Amendment claim focused on the reasonableness of police conduct, viewed as a whole. See Cone. & Diss. Op. at 1133 (Hartz, J.). While there is much to commend that approach, for now at least that has not been the direction followed by the circuit courts; neither is it an issue I see the need to decide today given that it was not briefed to us and, even if viewed as an independent cause of action, I would conclude that neither of the Cortezes states a claim based on excessive force.

. For example, in Wheeler v. Scarafiotti, 85 Fed.Appx. 696 (10th Cir.2004) (unpub.), we held that absent an allegation of "bodily or physical injury,” screaming at a defendant, placing a hand near a holstered weapon, and threatening possible incarceration was not sufficient to constitute an excessive use of force. Id. at 699. In Rucker v. Hampton, 49 Fed.Appx. 806 (10th Cir.2002) (unpub.), we held that following a suspect into his home, putting him in a headlock, and holding his arm behind his back for fifteen to twenty minutes does not constitute an excessive use of force where the suspect ignored police orders and fled into his home. Id. at 809-11. And, in Chamberlain v. City of Albuquerque, No. 92-2089, 1993 WL 96883 (10th Cir. March 29, 1993) (unpub.), we affirmed the district court's holding that keeping a suspect at gunpoint for a short period despite his raised and empty hands is not sufficient to create a viable claim for excessive force. Id. at *2-*3, *7-*8.

. While the majority does not explain why it reaches a contrary conclusion, Judge McConnell emphasizes the officers' entry into the Cortezes’ home as part of the excessive force analysis. See Cone. & Diss. Op. at 1137 (McConnell, J.). But the majority and I agree that a critical part of what made Ms. Cortez's seizure unlawful was the fact that it occurred by means of the entry into her home. See Maj. Op. at 1123; supra pp. 1118-19. Under the Court's virtually unanimous analysis, therefore, Ms. Cortez is entitled to recover fully and appropriately for the circumstances that rendered her seizure unlawful-including the entry that was essential to its effectuation. See also infra p. 25. It would be anomalous to hold the same singular fact is not just relevant to, but the gravamen of, two independent and distinct causes of action, and doing so risks the double-counting of damages. While Judge Hartz suggests a unified Fourth Amendment claim to prevent such problems, for now we are obligated to parse the claims into two. See supra note 12. Nor is this just a practical problem, but an analytical one. In order to evaluate whether any Terry stop seizure was lawful or not we are instructed to ask not just whether the stop "was justified at its inception” by reasonable suspicion but also whether the nature of the seizure was *1147 "reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. 1, 88, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). That is, in assessing the lawfulness or unlawfulness of a Terry stop, the Supreme Court has told us to consider the nature of the seizure itself, not just the question whether reasonable suspicion existed at its inception. Judge McConnell, meanwhile, seeks to use the very same (second) Terry factor that we must consider in determining the lawfulness of the seizure as the touchstone for his excessive force analysis. Thus, analytically, the two claims merge.

. See generally Samuelson v. City of New Ulm, 455 F.3d 871, 876 (8th Cir.2006) (genuine issue of fact as to excessive force claim based in part on evidence that plaintiff sustained shoulder injury serious enough to require surgery); Martin v. Bd. of County Comm’rs, 909 F.2d 402, 407 (10th Cir.1990) (finding excessive force where officers escorted plaintiff — who was injured from a recent *1148 automobile accident — out of hospital and into police van, drove less than five miles per hour to county jail, and released her approximately 90 minutes later; "Plaintiff has demonstrated that defendants’ alleged deliberate and unreasonable conduct in effecting her arrest created a serious known risk of physical trauma resulting in aggravation of an existing fracture to her neck in violation of clearly established law.").

. The majority suggests that I would preclude excessive force claims involving nonphysical injuries implicating one’s sense of security or dignitary interests. Maj. Op. at 1131 n. 26. That is not the case. Rather, I have indicated only that our precedents, the guidance we have received from the Supreme Court, and analogous areas of law, all suggest that a plaintiff is entitled to show excessiveness in any case either by reference to the egregiousness of the force employed, in and of itself, or by reference to some non-de minimis injury, whether physical or non-physical.

. They don't for good reason. In Walker v. City of Orem, 451 F.3d 1139 (10th Cir.2006), a panel of this Court only recently held that officers were protected by qualified immunity from an unlawful detention claim even though they escorted witnesses (who were suspected of no crime themselves) into a home at gunpoint and detained them for more than an hour. The court explained that its decision was compelled by the lack of "direct guidance ... on the outer contours of legally-permissible detention of witnesses.” Id. at 1151 (emphasis added). Exactly the same might be said of the outer contours of what constitutes legally-permissible force in detaining witnesses.

. Indeed, the majority relies on the Court’s language describing the plaintiff's complaint, rather than upon any holding or even explanatory dicta from the Court itself. Compare Maj. Op. at 1131-32, with Bivens, 403 U.S. at 389-90, 91 S.Ct. 1999.