**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**File Name:  08a0497n.06**

**Filed:  August 14, 2008**

**No. 06-2412**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff/Appellee, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR THE |
| | ) EASTERN DISTRICT OF MICHIGAN, |
| MUKUNDA DEV MUKHERJEE, M.D., | ) SOUTHERN DIVISION |
| | ) |
| Defendant/Appellant. | ) |

Before:  BATCHELDER, SUTTON, and FRIEDMAN,[*] Circuit Judges.

FRIEDMAN, Circuit Judge.   The appellant, Mukunda Dev Mukherjee, a physician, challenges his jury conviction in the United States District Court for the Eastern District of Michigan of forty-four counts of illegal distribution of controlled substances and his sentence.  The case involved Dr. Mukherjee's writing of a large number of prescriptions for controlled substances, including oxycontin and vicodin, at a charge of $45 per prescription.  We affirm both his conviction and his sentence.

---

[*]  Daniel M. Friedman, Senior Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

No. 06-2412
*U.S. v. Mukunda Dev Mukherjee, M.D.*

I

A. There was evidence, the sufficiency of which to support the verdict is not challenged, from which the jury could have found:

Dr. Mukherjee had his office in Flint, Michigan, where his office hours were from 10 a.m. until sometimes as late as 3 a.m. The examination table in his office was covered with files and boxes. The only medical equipment in the office were tongue depressors and an x-ray machine. In seeing patients, Dr. Mukherjee sat behind his desk, frequently with his feet on it and wearing a baseball hat.

Patients, who were unknown to each other, entered the office in groups of two to four. In return for $45.00 in cash paid directly to Dr. Mukherjee, each patient received a prescription for a controlled substance. If the patient wanted an additional prescription (which was post-dated), the total fee was $90.00. Dr. Mukherjee required his patients to have an MRI report in order to obtain a prescription for oxycontin, a highly addictive drug. He frequently issued prescriptions without making any physical examination of the patient.

At some point, the pharmacies in Flint refused to fill Dr. Mukherjee's prescriptions. Dr. Mukherjee's staff identified for patients other pharmacies elsewhere in Michigan where they could have their prescriptions filled. Patients traveled to those locations for that purpose.

- 2 -

B.  The superceding indictment charged Dr. Mukherjee and two others with one count of conspiracy to distribute controlled substances and fifty-four counts of illegally distributing prescriptions for such substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C ), (b)(1)(D) and (b)(3).  The jury convicted him of forty-four counts of illegal distribution and acquitted him of ten counts of illegal distribution and of conspiracy.  Each distribution count involved a prescription for a particular controlled substance issued to a particular patient.

At trial, the prosecutor introduced the testimony of three undercover police officers who, using false names, made a total of seven visits to the doctor's office over a three-month period. Collectively, they obtained fifty-three prescriptions for various controlled substances, paying Dr. Mukherjee $45.00 in cash for each one.  Dr. Mukherjee did not physically examine the officers before issuing the prescriptions to them.

Dr. Mukherjee testified in his own defense.  He stated that he had issued the prescriptions for the controlled substances to alleviate the patients' severe pain, that such prescribing was proper and appropriate medical practice, and that he had done nothing wrong.  In response to the question "[y]ou're telling these jurors that herding three or four people into your office that don't know each other is a legitimate medical practice, is that your testimony, sir?", he stated: "[a]bsolutely and totally."

At the end of his cross-examination, there was the following colloquy between the prosecutor and Dr. Mukherjee:

Q: As far as you're concerned, Dr. Mukherjee, you did nothing wrong, isn't that true?

A: Yes, that is correct . . .

Q: Sir, would you listen to me. Given another chance you'd write every one of those controlled substance prescriptions again that you wrote in 2001 and '04, you're ready to go, right? You'd do it again? Sir?

A: Yes.

In determining Dr. Mukherjee's sentence, the district court imposed the statutory maximum under each count, to be served consecutively. The district court stated that it was imposing a life sentence, and the parties have treated the sentence as such. The sentences total 328 years. Dr. Mukherjee was sixty-four years old at the time of sentencing.

II

Dr. Mukherjee challenges his conviction on four grounds. None is persuasive.

A. He contends that he was denied a fair trial because the district court excluded the testimony of his expert witness, Dr. Baumann. The government had introduced the testimony of Dr. Thornburg, an osteopathic physician and pharmacologist, who opined that Dr. Mukherjee's issuance of the prescriptions for controlled substances was not a proper medical practice. Dr. Mukherjee then proposed to call as an expert witness Dr. Baumann, a pharmacist who had a doctorate of pharmacy. According to Dr. Mukherjee, Dr. Baumann was an expert in pain management, who apparently would testify that Dr. Mukherjee's actions were medically appropriate. His defense counsel told the court that Dr. Baumann would "be able to testify based upon his experience, based upon his

credentials that what the doctor was doing and what he did was part of a legitimate medical practice."

The district court refused to permit Dr. Baumann to testify. The court stated: "while he may be a very esteemed person in the field of pharmacy – of the practice of pharmacy and what he does at Munsen Medical Center, . . . I don't think he's got the qualifications to evaluate the actions of this physician in his practice." When Dr. Mukherjee suggested that Dr. Baumann would be qualified to testify as an expert in pain management, the court responded: "[h]e's not a medical doctor, he's not a - - he's not a D.O., he's not an M.D. And I don't think that under the circumstances his testimony is admissible on this matter."

We review a district court's ruling on whether to permit an expert witness to testify before a jury for abuse of discretion. *United States v. Jones*, 107 F.3d 1147, 1150-51 (6th Cir. 1997). Dr. Baumann was a pharmacist who could not issue prescriptions. He was not a physician. His professional skills and qualifications were in analyzing and filling prescriptions. He may have been an expert in pain management, but that expertise did not extend to determining what treatment (including appropriate medication) would be appropriate for a particular condition or patient. The district court did not abuse its discretion in refusing to permit Dr. Baumann to testify that Dr. Mukherjee's issuance of a large number of prescriptions for controlled substances constituted appropriate medical practice.

B. Dr. Mukherjee accuses the government of prosecutorial misconduct because the prosecutor kept in the courtroom boxes containing all the prescriptions that Dr. Mukherjee had issued during the three-year period charged in the conspiracy count. According to Dr. Mukherjee, "by putting boxes of prescriptions in plain sight of the jury - and deliberately referencing them while cross-examining Defendant as though they were all 80 mg OxyContin prescriptions - the prosecutor was suggesting to the jurors that they should assume every prescription in the boxes was written without a legitimate medical purpose."

Nothing in the record supports such hyperbole. The prescriptions had been listed on the government's exhibit list. During cross-examination of Dr. Mukherjee the prosecutor stated that he might offer the prescriptions in his rebuttal, although he did not do so. The presence of the boxes in the courtroom did not deny Dr. Mukherjee a fair trial.

C. Dr. Mukherjee next contends that he was denied a fair trial when the government excused a female, African-American juror after she had been seen talking to a man who had attended the trial and sat behind Dr. Mukherjee and apparently was a friend of his. The conversation took place after the jury had been excused at the end of the day.

The following morning the court questioned the juror about the incident and was told that she had not discussed the case and that the man had returned to Chicago. When the court wondered whether the juror should be excused, defense counsel stated: "[w]e'll leave that up to Your Honor." After further questioning of the juror, the court stated that: "it might be best under the circumstances

if I excuse you from the jury because there might be - - might be a possible indication here that some impropriety, and - - and especially when I learned the gentleman that engaged you in that conversation is a friend of the defendant here." The court excused the juror and defense counsel objected.

Considering all the circumstances, the district court acted within its discretion in excusing the juror. Indeed, it appeared that initially defense counsel had not objected but left it to the court to do what it deemed appropriate.

D. Finally, Dr. Mukherjee contends that at his trial he was denied effective assistance of counsel because of three alleged errors his attorney committed. "[W]e typically do not consider ineffective assistance of counsel claims on direct appeal, because the record usually is not sufficiently developed to permit proper assessment of such claims." *United States v. Neuhausser*, 241 F.3d 460, 474 (6th Cir. 2001). We follow that practice here. Moreover, considering the nature of the alleged deficiencies by counsel and the strength of the government's case, it appears unlikely that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result" or that counsel's alleged "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).

III

A. The district court held three separate hearings, at which witnesses testified, before announcing the sentence. It recognized that "the guidelines in this case are no longer mandatory

guidelines, they are suggested guidelines." The court "determin[ed], finally," to "follow the

guidelines, finding them to be an appropriate penalty in this matter even though as I say the

guidelines are not - - are not mandatory. And I find that the guideline range in this particular offense

is certainly an appropriate one for infliction of a - - an appropriate penalty." The court explained at

length how and why it imposed the particular sentence.

The court determined that the proper offense level under the guidelines was 36. The principal

issue in dispute was the amount of drugs covered by the prescriptions Dr. Mukherjee had issued.

The court concluded that

> [b]ased on all the testimony and other evidence offered at trial, there is a
> preponderance of the evidence that the drug amount represented in defendant's
> convictions does not reflect the scale of the offense in which defendant was involved.
>
> The Court finds that the defendant wrote many more prescriptions without a
> legitimate medical purpose than the 44 prescriptions in his counts of conviction. And
> that defendant's medical office was effectively a prescription mill with addicts
> coming from out of state even to get prescriptions, eventually making local
> pharmacies suspicious of defendant's practice.

The court utilized data provided by "the Michigan Automated Prescription System," "a

system established by the State of Michigan that records all prescriptions for Schedule II, III, IV, and

V controlled substances." It explained:

> In this case MAPS recorded all prescriptions for scheduled drugs that were
> written by the defendant between January the 1st, 2003 and June the 30th, 2004.
> Based on the sentencing guidelines, the quantity of drugs prescribed between January
> 1st, 2003 and June 30th, 2004, were converted into an equivalent marijuana amount
> using all the drugs prescribed by defendant and recorded in MAPS gives a marijuana
> equivalency of 35,262.549 kilograms.

The Probation Department had reduced the number of prescriptions written by twenty-five percent because not all of them were necessarily medically inappropriate. This calculation "yield[ed] a total marijuana equivalent amount of 26,463.49 kilograms of marijuana. And that results in a base offense level of 36." The court pointed out that even if the total amount of drugs involved in the MAPS data were reduced by 70 percent, "all the way down to 10,578.765 kilograms of marijuana equivalent, this would still correspond to a base offense level of 36." The court rejected Dr. Mukherjee's contention that only the amount of controlled substances involved in the counts on which he was convicted could be used in determining his offense level.

After calculating the offense level as 36, the district court made three upward adjustments that are here unchallenged– two levels for abuse of a position of trust, four levels for a leadership role, and two levels for obstruction of justice by giving false testimony. The court denied Dr. Mukherjee's request for a two level downward departure. These calculations produced a total offense level of 44, for which the guideline range was life imprisonment. The court imposed a life sentence. Because none of the counts of conviction provided for a life sentence, however, the court explained that the sentence consisted of the statutory maximum on each count of conviction, to be served consecutively.

B. Dr. Mukherjee's principal challenge to his sentence is his claim that because the jury did not make any findings of the total number of prescriptions for controlled substances he had issued, the district court's reliance on the MAPS data was improper. According to Dr. Mukherjee, the district court should have based the sentence solely upon the prescriptions involved in the counts of

conviction, which would have produced a total offense level of 28, with a guideline sentencing range of 78-97 months. He relies upon the Supreme Court decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005), and their progeny, as establishing that, in determining the sentence, the district court may not find, based on a preponderance of the evidence, facts that the jury had not found.

Dr. Mukherjee reads those cases too broadly. The limitation to jury-found facts applies only if the court imposes a guideline sentence that exceeds the statutory or mandatory guidelines maximum. *See Booker*, 543 U.S. at 244 (stating that "[a]ny fact . . . which is necessary to support a sentence *exceeding the maximum authorized* by the facts established by . . . a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt")(emphasis added). This court has held that, in determining an advisory guideline sentence, a district court may find by a preponderance of the evidence additional facts not found by the jury. *United States v. Gates*, 461 F.3d 703, 707-08 (6th Cir.), *cert. denied*, 127 S. Ct. 602 (2006); *see also United States v. Cook*, 453 F.3d 775, 776-77 (6th Cir. 2006). The district court did not err in making additional findings based on the MAPS data in determining the offense level.

Dr. Mukherjee also contends that in determining his sentence, the district court failed adequately to consider the factors that 18 U.S.C. § 3553(a) states the court "shall consider" "in determining the particular sentence to be imposed," which shall be "sufficient, but not greater than necessary, to comply with" certain of those factors. The district court, however, is not required to discuss in detail each of those factors. *United States v. Gale*, 468 F.3d 929, 940 (6th Cir. 2006);

*United States v. Harness*, 453 F.3d 752, 757 (6th Cir. 2006); *United States v. Kirby*, 418 F.3d 621, 626 (6th Cir. 2005). It suffices if the district court's findings show that the court considered those factors. *See United States v. Smith*, 505 F.3d 463, 467-68 (6th Cir. 2007) ("When reviewing a district court's consideration of the § 3553(a) factors, we have never required 'the ritual incantation of the factors to affirm a sentence.' To hold otherwise when the record shows adequate proof of deliberation would effectively insert an unnecessary insistence upon formalism into the statute.").

Here the district court adequately explained the factors it considered in determining the sentence. In addition to the statements previously quoted, the court also stated that it "has carefully and thoroughly considered the - - the sentencing guidelines and has also carefully and thoroughly considered all the factors contained in Title 18 of the United States Code, Section 3553(a)." The court considered but rejected Dr. Mukherjee's argument that "there should be a downward departure because of his age and health, because of his lack of a prior criminal history, and because he would suffer enough with the revocation of his medical license. And because he is a potential asset to society as a contributing member and because there is a low risk of him being a repeat offender . . . Having considered all the evidence presented to this Court, the Court finds that the defendant's offense was egregious, indeed egregious and defendant's situation does not merit any downward departure." [J.A. 2009-10] The court also stated that Dr. Mukherjee "has substantial medical credentials, including previous teaching positions at various hospitals and universities, however for

unknown reasons, his medical practice has deteriorated drastically and ultimately he in effect became a distributor of drugs and nothing more."

Finally, Dr. Mukherjee contends that the district court's imposition of consecutive sentences violated the guidelines "grouping" standard. That standard states:

> If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.

Here, the "highest statutory maximum" under the counts of conviction was twenty years, which was less than the life sentence the guidelines provided that the district court decided to impose. The guidelines thus permitted the imposition of consecutive sentences. *See Jenkins v. United States*, 394 F.3d 407, 410-12 (6th Cir. 2005) (even if counts grouped together, this does not prevent consecutive sentences under § 5G1.2); *United States v. Colbert*, 977 F.2d 203, 205-07 (6th Cir. 1992) (consecutive sentences of sixty months, sixty months, and fifteen months appropriate on separate perjury counts in order to reach the guidelines-approved sentence of 135 months); *see also*, 18 U.S.C. § 3584(b) (authorizing consecutive terms following consideration of the factors set forth in § 3553(a)). Such consecutive sentences were an appropriate method of effecting the life sentence that the guidelines authorized and the district court imposed.

C. We have considered Dr. Mukherjee's other contentions, but find them unpersuasive. We need not further discuss them.

No. 06-2412
*U.S. v. Mukunda Dev Mukherjee, M.D.*

The judgment of the district court embodying Dr. Mukherjee's convictions and sentence is affirmed.